531 P.2d 573

Carlyle CHICK and H. Lowell Hatch,
Plaintiffs-Respondents,

v.

K. D. TOMLINSON and Lewis Korth Lumber Company, Inc., a Washington Corporation, Defendants-Appellants.

No. 11414.

Supreme Court of Idaho.

Feb. 4, 1975.

Robert L. Aldridge, Anderson, Kaufman, Anderson & Ringert, Boise, Jerome G. Arnold, Hunt & Arnold, Duluth, Minn., for defendants-appellants.

James W. Givens, Lewiston, for plaintiffs-respondents.

DONALDSON, Justice.

In 1963, Carlyle Chick and H. Lowell Hatch, hereinafter called respondents, began working at appellant Lewis Korth Lumber Company for K. D. Tomlinson, appellant. Prior to taking a managerial position in that company, a corporation owned by Tomlinson, Chick worked for a time at another corporation, Beard and Company, also owned by Tomlinson. Hatch, during 1962, was simultaneously employed by Tomlinson for Tomlinson Lumber Sales and by a Mr. Davenport for Tri-Lakes Lumber Company. Tomlinson owned Tomlinson Lumber Sales, but not Tri-Lakes. Each corporation paid one-half of Hatch's salary. The assets of Tri-Lakes were subsequently purchased by Tomlinson upon the bankruptcy of Tri-Lakes. Following the bankruptcy, Hatch was guardian protector of the inventory of Tri-Lakes and was paid by Tomlinson through Lawrence Warehouse which was storing the inventory. Hatch subsequently occupied the managerial position at Lewis Korth Company.

In return for their efforts at Lewis Korth Lumber Company, respondents were to each receive $500 per month salary, certain expenses, and bonuses gauged by the profits of the company. These terms were set by oral agreement. It is agreed by all parties that funds for the bonuses were to be those monies representing 40% of all net profits above the first $25,000. The dispute is found in the determination and distribution of those funds.

Although the respondents were employed at Lewis Korth from 1963 to 1971, profits sufficient to fund the bonus program were made only in 1963, 1967, and 1968. The bonus for 1963 was $8,500 each while the 1967 figure was $6,500 each. Neither of these amounts is in question. However 1968 was an excellent year for the lumber business and the relatively large profits for that year are the basis for this dispute.

Appellant Tomlinson contends that the 1968 net profit figure was $77,326.82, which resulted in $20,930.72 available for distribution by the bonus plan, i. e. 40% of profits after the first $25,000.00. The trial court amended the net profit figure to $194,323.96, with $67,729.58 for distribution. The trial court arrived at this sum by disallowing deductions of $25,000 for Tomlinson's salary and of $20,000 for a bonus reserve fund taken by Tomlinson from the net profit. The trial court also disallowed an accounting procedure utilized by Tomlinson wherein the closing lumber inventory of Lewis Korth Lumber Company was intentionally understated by over one million board feet. This procedure had the effect of reducing the profit by $71,997.14, which was subsequently added back in by the trial court in arriving at its figure of $67,729.58, net profit for distribution.

The trial court then determined that the oral bonus agreement required that the $67,729.58 be evenly divided between Chick and Hatch (less a $4,600 set-off for an advance received by Chick). Because the action was brought to recover unpaid bonuses for all three years, the trial court held Chick to be entitled to $44,264.79, with interest at the rate of 6% per annum from January 1, 1968, on the sum of $15,000 (1963 and 1967 bonuses) plus interest at the rate of 6% per annum from January 1, 1969 on the sum of $29,264.79 (1968 bonus), and Hatch to be entitled to judgment in the sum of $48,864.79 with interest at the rate of 6% per annum from January 1, 1968, on the sum of $15,000 (1963 and 1967 bonuses) and interest at the rate of 6% per annum from January 1, 1969, on the sum of $33,864.79 (1968 bonus). Finally the trial court held that K. D. Tomlinson and Lewis Korth Lumber Company would be jointly and severally liable for those money judgments.

From these findings of fact and conclusions of law, this appeal is taken.

Appellant assigns as error the trial court determination that K. D. Tomlinson be personally liable for the sums due respondents under the bonus agreement. Tomlinson contends that respondents were employed by Lewis Korth Lumber Company, not himself, and thus should be allowed to look only to the corporation for remuneration. Moreover, Tomlinson continues, by dealing with the corporate entity, e. g., accepting corporate payroll checks, the respondents are estopped from now rejecting the corporate entity. Jolley v. Idaho Securities, Inc., 90 Idaho 373, 414 P.2d 879 (1966).

The Idaho rule on disregarding the corporate entity is well summarized in Surety Life Ins. Co. v. Rose Chapel Mortuary, Inc., 95 Idaho 599, 514 P.2d 594 (1973), wherein the Court stated as follows:

"It is the general rule that the conditions under which a corporate entity may be disregarded vary according to the circumstances of each case. Automotriz Del Golfo De California v. Resnick, 47 Cal.2d 792, 306 P.2d 1 (1957). However, two requirements for application of the doctrine are (1) that there be such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2), that if the acts are treated as those of the corporation an inequitable result will follow, Jolley v. Idaho Securities, Inc., 90 Idaho 373, 414 P.2d 879 (1966); 18 Am.Jur.2d 561, Corporations, § 15 (1965); 18 C.J.S. Corporations § 6, p. 376 (1939); Fletcher, Corporations, § 41, at page 166 (1963). As this Court stated in Tom Nakamura, Inc. v. G. & G. Produce Company, 93 Idaho 183, 457

P.2d 422 (1969), quoting with approval from Hayhurst v. Boyd, 50 Idaho 752, 300 P. 895 (1931):

> " ' "To warrant casting aside the legal fiction of distinct corporate existence * * * it must also be shown that there is such a unity of interest and ownership that the individuality of such corporation and such person had ceased; and it must further appear from the facts that the observance of the fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice." ' 93 Idaho at 185, 457 P.2d at 424."

95 Idaho at 601, 514 P.2d at 596.

■ In the case before the Court the record readily illustrates the merger of identity of Tomlinson and his various enterprises. The trial court's Findings of Fact 25 and 26 read as follows:

> "25. The record in this case is replete with evidence that the corporation and K. D. Tomlinson was one and the same person. Tomlinson was the sole stockholder and president of the corporation and there was no evidence of any meetings of the Board of Directors nor any corporate action taken by the directors, either approving or disapproving any of the actions of its president. In fact, the contracts and agreements executed by Tomlinson on behalf of the corporation were never submitted to the Board of Directors for their approval. The unilateral attempt to take a $25,000.00 salary in the year 1968 for the first time is additional evidence of the fact that Tomlinson alone ran and controlled the corporation and acted without regard to its corporate existence. As previously pointed out, the president revised the inventory to suit his ideas of a proper business practice without ever sanctioning such action with any Board of Directors or other officers.
>
> "26. In the dealings between Lewis Korth Lumber Co. and other corporations, owned and controlled by Tomlinson, it was evident that funds were transferred, accounts paid or allowed to accrue, interest paid or not paid, and intercompany claims satisfied without any action thereon by any officer or director of any of said corporations except Tomlinson." (citation of authority omitted.)

In essence, Tomlinson was running a one-man show. The identities have indeed merged, thus satisfying the first part of the rule in *Surety Life*.

■ The record clearly establishes that the case before the Court also meets the second part of that rule. Here, as in *Surety Life*, "[t]o adhere to corporate distinctions which the incorporators, directors and stockholders do not even recognize and follow, other than by maintaining separate accounting books for each corporation, would * * * produce substantial inequities." 95 Idaho at 602, 514 P.2d at 597. The record discloses that the Lewis Korth Lumber Company is in a tenuous position in regard to gathering the cash necessary to meet the obligation. This factor, when combined with the company's spotty profit record, indicates that the respondents' opportunities of enforcing the money judgment would be impaired by a denial of Tomlinson's personal liability. As the trial court noted, Tomlinson personally hired the respondents, eventually assigned them to Lewis Korth Lumber Company, and issued to them promissory notes bearing his signature for the 1963 and 1967 bonuses. To allow Tomlinson to deny liability and force respondents to look solely to the company for remuneration would clearly result in an injustice.

■■ Tomlinson's contention of estoppel is based on the rule in *Jolley* that when one deals with a corporation *as such* that person may not subsequently deny the existence of that corporation. However the respondents' acitivity cannot be said to be dealing with the corporation as such. Both Hatch and Chick were put on other projects by Tomlinson before going to Lewis Korth. The various inter-corporate transactions were conducted by Tomlinson. All questions were answered solely by

Tomlinson. Tomlinson chose to pay the respondents through Lewis Korth. Their acceptance of such checks can hardly be said to be an acknowledgement of a corporate identity. The respondents are not estopped from seeking satisfaction of the judgment from K. D. Tomlinson.

Appellants also assign as error the trial court's findings of fact as to the terms of the bonus agreement. The oral agreement was found to call for a division between Hatch and Chick of 40% of the net profits above the first $25,000.

■■■■ The construction of oral employment contracts at times calls for evidence beyond the words of the express agreement. Lewis v. Utah Construction Company, 10 Idaho 214, 77 P. 336 (1904). This evidence is utilized to determine the intentions of the parties, which is the primary rule of contract construction. Transamerica Leasing Corp. v. Van's Realty Co., 91 Idaho 510, 427 P.2d 284 (1967). The conduct under the contract of the parties is one of the major factors in determining such intentions. Cottle v. Oregon Mutual Life Insurance Co., 60 Idaho 628, 94 P.2d 1079 (1939); Stender v. Twin City Foods, 82 Wash.2d 250, 510 P.2d 221 (1973); Tarlow v. Arntson, 264 Or. 294, 505 P.2d 338 (1973); Bohman v. Berg, 54 Cal.2d 787, 8 Cal.Rptr. 441, 356 P.2d 185 (1960). In both 1963 and 1967 the respondents were awarded bonuses that amounted to a large percentage of the funds available for distribution under the formula.[1] This conduct, combined with testimony by the respondents as to the terms offered by Tomlinson, provides the substantial evidence, regardless of conflict, necessary to support the findings of fact of the trial court. Jensen v. Chandler, 77 Idaho 303, 291 P.2d 1116 (1955).

■■■ The trial court's determination that Tomlinson's salary deduction and the bonus reserve deduction from the 1968 net profits be disallowed as contrary to the bonus agreement is also assigned as error. As

discussed above the terms to such an agreement at times may be ascertained by the conduct of the parties. During the several years of the respondents' employment at Lewis Korth Lumber Company, only in 1968 were these deductions taken. This unilateral, one-time attempt is sufficient evidence to support the trial court's determination that the deductions were not in accord with the agreement.

The trial court's revaluation of the 1968 lumber inventory is assigned as error. As we noted above, 1968 was a bumper year in the industry. Lewis Korth Lumber Company earned record profits. Tomlinson testified that traditionally such years are followed by large increases in costs as workers seek wage increases. In order to "hedge" against this, Tomlinson continued, he ordered the closing inventory of the lumber lowered by over one million board feet. This was done allegedly to compensate for the lower price the then green lumber would demand the following spring, and had the net effect of lowering the 1968 profit figure by $71,997.14.

Appellant Tomlinson argues that the trial court disregarded the only expert testimony as to the acceptability of that accounting procedure. Victor Wakefield, a CPA, did testify as a witness for the appellant, and a segment of that testimony was as follows:

"Q: [By Mr. Givens] Now, do you, is the inventory based in board feet and dollar volume contained in your report, your inventory and adjusted inventory?

"A: [By Mr. Wakefield] It is an adjusted inventory.

"Q: And does that meet normal and accepted accounting practices?

"A: Well, the technical word, probably not, but by and large most any business has a tendency to put these hedges in in those years."

1. In 1963 the bonuses to respondents totalled $17,000 out of an available $17,707.73. In 1967 bonuses to respondents totalled $13,000 out of an available $20,497.93.

**488**

(Reporter's Transcript, p. 210–211, lines 23–25, 1–6.)

The trial court elected to place greater weight on the first part of the second answer and found the accounting procedure to be unacceptable.

█ In this the trial court was correct. Assuming *arguendo* that inventory adjustment was called for, placing one million board feet "under the rock," as Tomlinson termed it, is hardly the correct way to go about it. The position of the American Institute of Certified Public Accountants is as follows:

### "STATEMENT 5

"A departure from the cost basis of pricing the inventory is required when the utility of the goods is no longer as great as its cost. Where there is evidence that the utility of goods, in their disposal in the ordinary course of business, will be less than cost, whether due to physical deterioration, obsolescence, changes in price levels, or other causes, the difference should be recognized as a loss of the current period. This is generally accomplished by stating such goods at a lower level commonly designated as *market*.

"Discussion

.08 Although the cost basis ordinarily achieves the objective of a proper matching of costs and revenues, under certain circumstances cost may not be the amount properly chargeable against the revenues of future periods. A departure from cost is required in these circumstances because cost is satisfactory only if the utility of the goods has not diminished since their acquisition; a loss of utility is to be reflected as a charge against the revenues of the period in which it occurs. Thus, in accounting for inventories, a loss should be recognized whenever the utility of goods is impaired by damage, deterioration, obsolescence, changes in price levels, or other causes. The measurement of such losses is accomplished by applying the rule of pricing inventories at *cost or market, whichever is lower*. This provides a practical means of measuring utility and thereby determining the amount of the loss to be recognized and accounted for in the current period." APB Accounting Principles, § 5121.08.

By failing to adopt the procedure traditionally called "cost or market, whichever is lower" Tomlinson went beyond accepted accounting procedures, and the trial court correctly rejected the devaluation of the inventory.

█ Appellant also assigns as error the trial court determination that interest of 6% be assessed beginning January 1, 1968, on the sums due respondents for the 1963 and 1967 bonuses. In view of the conflicting and ambiguous record on that particular issue, we are unable to determine whether or not the holding of the trial court is correct. Therefore this particular determination is reversed and remanded to the district court for further findings of fact on this issue.

We have examined the remaining assignments of error and find them to be without merit.

Judgment affirmed in part, and reversed and remanded in part. Costs to appellants.

McQUADE, C. J., and McFADDEN and BAKES, JJ., concur.

SHEPARD, J., sat but did not participate.

### ON DENIAL OF PETITION FOR REHEARING

DONALDSON, Justice.

A petition for rehearing was filed on December 23, 1974, by appellants K. D. Tomlinson and Lewis Korth Lumber Company, Inc. The Court adheres to its previous opinion as modified on February 4, 1975.

Petition for rehearing denied.