624 P.2d 402

Loyale BABBITT, dba Babbitt Electrical
and Refrigeration,
Plaintiff-Respondent,

v.

Leslie L. MITCHELL, dba Mitchell
Construction Company,
Defendant-Appellant.

No. 12926.

Supreme Court of Idaho.

Feb. 26, 1981.

Clark Gasser of Green, Service, Gasser & Kerl, Pocatello, for defendant-appellant.

E. W. Pike of Albaugh, Smith, Pike & Martin, Idaho Falls, for plaintiff-respondent.

McFADDEN, Justice.

Loyale Babbitt, doing business as Babbitt Electrical and Refrigeration Company, entered into a contract with Leslie L. Mitchell,

doing business as Mitchell Construction Company, to undertake certain subcontractual work in the construction of an elementary school building at Preston, Idaho. Upon completion of the project, Babbitt Electrical and Refrigeration Company (hereinafter, Babbitt) brought an action to collect the balance to be due from the general contractor, Mitchell Construction Company (hereinafter, Mitchell) under the terms of the subcontract. After trial, the district court entered judgment against Mitchell for the amount alleged to be owed Babbitt. Mitchell appeals from the judgment. We affirm.

The record discloses the following facts giving rise to this appeal:

In 1971, Mitchell and the Eastside School District no. 201 entered into a contract for the construction of an elementary school building at Preston, Idaho. The contract between the parties consisted of the following documents: the agreement, the conditions of the contract, the drawings, the specifications, all addenda issued prior to the execution of the contract, and all modifications thereto. Under the general conditions of the contract, Mitchell was solely responsible to the school district for all work performed in the construction of the elementary school, including the work of any subcontractors. Mitchell subcontracted out the work described in the roofing, sheet metal, heating ventilation and temperature controls, and plumbing sections of the contract document entitled "Specification ... For the Construction of New Elementary School at Preston, Idaho for Eastside School District # 201."

On October 13, 1971, Mitchell and Babbitt entered into a written subcontract agreement. Pursuant to the agreement, Babbitt was to complete all work of Section 19, "Heating, Ventilation and Temperature Controls," and Section 20, "Plumbing," of the aforementioned document detailing the specifications for the construction of the school. The instant controversy only involves the work specified in Section 19, with the relevant provisions including, but not being limited to, the following:

"A. Work included—The work consists of, but not limited to the furnishing of all plant, labor, equipment, appliances, and materials and in performing all operations in connection with the installation of the following.
1. Heating piping and equipment
2. Ventilating system and equipment
3. Insulation
4. Identification"

. . . . .

"SECTION 13. MATERIALS AND EQUIPMENT

D. *Heating and Cooling Roof Top Units*
1. The Contractor shall provide and install roof top heating, ventilating and air-conditioning units of the size and type indicated on the plans. Each unit shall be complete and ready for operation. All accessories and other equipment necessary to properly install the units shall be included in the equipment"

. . . . .

3. The General Contractor shall provide raised bases on which to mount the units. It shall be constructed of 2″ × 10″ wood members spanning the roof joists and tied together with a ¾″ plywood deck. The entire structural base shall be trimmed with a cant strip and covered with 24 gauge galvanized sheet metal flashed into the roof and trimmed with a drip flashing."

Moisture eventually leaked around and under the raised bases supporting the heating, ventilating and air conditioning units, causing damage to the roof and interior ceilings of the school building. The primary source of the leakage was that the multiple pieces of sheet metal covering the raised bases and flashed into the roof were butted together without watertight joints. Instead, they were joined by asphalt masking smeared on the top of the sheet metal. An additional source of the leakage was that the bases had not been trimmed with a drip flashing.

Mitchell employed Parr Electrical and Mechanical Company to remedy the situa-

tion. Mitchell apparently withheld full payment to Babbitt, deducting the amount he paid Parr Electrical and Mechanical Company for the remedial work from the sum agreed upon in the subcontract.

Babbitt then brought an action to collect the balance he claimed to be due from Mitchell under the terms of the subcontract. Mitchell counterclaimed for the amount he paid for the remedial work. The parties stipulated that the sum in dispute was $5,439.48.

At trial, Babbitt introduced into evidence the subcontract between Mitchell and himself as well as the specifications for the construction of the elementary school building. Babbitt also testified that he had performed the work and furnished the materials in accordance with the terms of the subcontract prior to December 1, 1972, the completion date for the project as agreed upon by Mitchell and the school district. The testimony of Mitchell and two of his witnesses was to the contrary. Mitchell testified that Babbitt had the obligation under the specifications for the construction of the school of covering the raised bases with sheet metal properly flashed and trimmed with a drip flashing. He further testified that Babbitt's employees improperly joined the sheet metal covering the raised bases and flashed into the roof with asphalt smearing rather than with watertight joints, and failed to trim the bases with a drip flashing. Mr. Haycock, the architect employed by the school district as its representative on the project, also stated that Babbitt was the party who improperly performed the work under sub-section 13 D–3 of Section 19 of the specifications. Finally, there was the testimony of Mr. Nielson, the engineer whose firm was employed by Mr. Haycock to design the heating, ventilating and air conditioning systems for the construction project. Mr. Nielson testified that it was his understanding that Babbitt, as the mechanical subcontractor, was responsible for all of the provisions contained in the heating, ventilating and temperature controls section of the specifications, and that responsibility would therefore have included the work in question here. How-

ever, during cross-examination, Mr. Nielson admitted that the wording of sub-section 13 D–3 of Section 19 of the specifications did not specifically state that Babbitt was the party obligated to cover the raised bases with sheet metal properly flashed and trimmed with a drip flashing.

The trial court held in favor of Babbitt. In so holding, the trial court in its memorandum decision observed:

"From the contract it is the opinion of the court that the flashing was not the obligation of the Plaintiff herein.

The fact that the flashing was not installed with the proper joint was not the responsibility of the Plaintiff. Therefore, any leaks occurring therefrom was not chargeable to the Plaintiff.

The contract is confusing in its terms, however, by taking the terms of the contract in their entirety it is apparent Plaintiff performed the work in accordance with the terms of the contract and is entitled to be paid therefor."

These specific comments of the trial court were incorporated in the findings of fact, conclusions of law and judgment made by the court. Paragraphs V and VI of the findings of fact set forth the issues, and the findings that:

"V

(A) dispute arose between the parties as to the said balance owing of $5,439.48, by reason of defective flashing around the heating and air-conditioning units on the building roof that caused water to leak into the building. It was the contention of plaintiff that the construction and roofing of the raised bases for the heating and air conditioning roof top units, together with the covering of galvanized sheet metal with proper flashing installed, was the responsibility of defendant as general contractor. It was the contention of defendant that such construction was the responsibility of plaintiff. The court finds that under the terms of said subcontract agreement, and the plans and specifications for the performance of said

contract, that such construction was not the responsibility of plaintiff, and therefore, any remedial construction was not the obligation or responsibility of plaintiff, and defendant could not assess plaintiff a back charge therefor.

## VI

That plaintiff performed the work and furnished the materials in accordance with the terms of said subcontract and is entitled to be paid in full therefor."

Mitchell presents four issues on appeal. Summarily, they are: (1) did the trial court err in failing to make a finding of fact that Babbitt did not perform the installation of the faulty flashing; (2) did the trial court err in its finding that the covering of the raised bases supporting the heating, air conditioning, and ventilation units with sheet metal properly flashed was not the responsibility of Babbitt; (3) did the trial court err in its finding and conclusion that Babbitt performed the work and furnished materials in accordance with the terms of the subcontract; and (4) did the trial court err in disallowing any offset for the faulty work allegedly performed by Babbitt?

All four of the issues presented on appeal share a common premise: the subcontract and specifications are ambiguous as to whether Babbitt was the party responsible for performing the work detailed in subsection 13 D–3 of Section 19 of the specifications. Moreover, if the contract documents are unambiguous that the responsibility did not rest with Babbitt, then all four issues are necessarily extinguished. Specifically, there would be no need to have a finding of fact as to who did perform the work since it is a well-established rule that the conduct of parties to a contract and their practical interpretation of it as evidence of their intent is an appropriate factor to be looked at in interpreting a contract only if the contractual arrangement does not disclose the parties' intentions. *See, e. g., Commercial Credit Corp. v. S & E Enterprises, Inc.,* 97 Idaho 441, 546 P.2d 396 (1976); *Chick v. Tomlinson,* 96 Idaho 483, 531 P.2d 573 (1975). Similarly, the question of whether

Mitchell was entitled to a setoff for the remedial work undertaken would be without merit since there would be no underlying contractual obligation supporting the setoff. And finally, the question of whether Babbitt fully performed his duties in accordance with the terms of the subcontract would be vitiated since there is no question that he otherwise fully performed his duties as detailed in Sections 19 and 20 of the specifications.

Thus, the initial question before us is whether the contract is ambiguous. Mitchell contend that although subsection 13 D–3 of Section 19 of the specifications required him to furnish the raised bases on which to mount the heating, air conditioning and ventilation units, it did not state who was to trim them with a cant strip and cover them with sheet metal properly flashed and trimmed, and consequently, is inherently ambiguous. The contention, however, overlooks the well settled rule that "(t)he primary objective of construction of a contract is to discover the intention of the parties and in order to effectuate that objective the contract must be construed as a whole and considered in its entirety." *Beal v. Mars Larsen Ranch Corp., Inc.,* 99 Idaho 662, 668, 586 P.2d 1378, 1384 (1978).

Our review of the specifications in their entirety lead us to conclude that the trial court did not err as a matter of law in holding that Babbitt was under no contractual obligation to perform the work detailed in subsection 13 D–3 of Section 19 of the specifications. The responsibility for performing that work rested with several subcontractors other than Babbitt.

Section 5 of the specifications, entitled "Built-Up Roofing," indicate that the roofing subcontractor was responsible for properly flashing all roof fixtures, and that the carpentry section was to install cant strips to modify the angle between the roof deck and any vertical element of the roof prior to the application of the flashings. The relevant provisions in Section 5 of the specifications detailing this work are as follows:

"1. *GENERAL CONDITIONS*:

All applicable provisions of the General Conditions and all Information to Bidders govern work under this section.

2. *SCOPE OF THE WORK*:

This section includes the furnishing of all labor, materials, equipment, transportation and services required to complete the installation of a built-up roofing application over the entire roof deck. Notify Architect in writing before bid opening of any condition indicated on drawing or specified herein which will not qualify Owner for guarantee and bond.

3. *PREPARATION OF DECK*:

This built-up roofing application shall be applied over the wood deck and nailed properly thereto.

4. *ROOF VENTS*:

All roof fixtures passing through the roof such as vents, drains, etc., shall be properly flashed by turning back the two lower layers of roofing felt and mopped down to prevent drippage of roofing bitumen around the openings.

5. *FLASHINGS*:

Prior to application of flashings, a cant strip shall be installed to modify the angle between a roof deck and any vertical element of the structure. Cant strip shall be furnished and installed by the Carpentry Section. Built-up flashing shall consist of 3–15 lb. felts and 1–55 lb. asbestos sheet all set in steep asphalt."

In addition, Section 6 of the specifications, entitled "Sheet Metal Work," indicate that the sheet metal subcontractor was to cover the structural bases supporting the air conditioning and heating units with sheet metal properly flashed by virtue of his overall responsibility for performing all flashing and counter-flashing as described in the specifications. The relevant provisions in Section 6 of the specifications detailing this work are as follows:

"1. *SCOPE OF THE WORK*:

(A) EXTENT: The work required under this section consists of all sheet metal work indicated on drawings and described in these specifications.

(B) WORK INCLUDED IN THIS SECTION: Without restricting the volume or generality of the above extent, the work to be performed under this section shall include, but is not limited to the following:

1. Aluminum coping and reglet.

2. Flashing and counter flashing.

3. Miscellaneous other sheet metal work, screws, nails and anchors as they may be required.

4. Mansard Roof Metal.

5. Ventilating, Aluminum metal soffit.

(C) WORK NOT INCLUDED IN THIS SECTION:

1. Ductwork and related sheet metal as described in Heating & Ventilating Section."

Although duct work and related sheet metal work as described in Section 19 of the specifications is expressly excluded as part of the sheet metal subcontractor's duties, the subsections in Section 19 detailing the duct work and related sheet metal work disclose that Babbitt was only required to construct with sheet metal the ducts, casing, plenums and support hangers for the heating and ventilation systems. The provisions in Section 19 of the specifications detailing the sheet metal work Babbitt was responsible for are as follows:

"A. *Installation*—All necessary allowance and provisions shall be made in the installation of sheet metal ducts for the structural conditions of the building and ducts shall be transformed or divided as may be required. Whenever this is necessary, the required area shall be maintained. All of these changes, however, must be approved and installed as directed at the project site. During the installation, the open ends of all ducts shall be protected to prevent debris and dirt from entering.

B. *Materials and Gauges*—Construct all ducts, casing, plenums, etc., of galvanized steel sheets of the gauges specified below, unless otherwise shown. Sheets shall be free from blisters, slivers, pits and imperfectly galvanized spots. Construct ducts using double or Pittsburgh corner seams.

All seams shall be hammered and made air tight. All exposed ducts in finished areas shall have flat seams. All joints in ductwork shall be caulked airtight.

**Schedule for Rectangular Sheet Metal Duct Construction**

| Gal. Iron USS Gage | Max. Side Duct Inches | Transverse Joint Connection | Max. Length of Section |
|---|---|---|---|
| 26 | up to 18″ | S–slip | 8′-0″ |
| 24 | 19″ to 30″ | 1″ standing pocket slip (gov't lock) | 4′-0″ |
| 22 | 31″ to 40″ | 1-¼″ standing pocket slip (gov't lock) | 4′-0″ |

C. *Cross Breaking*—Rectangular sheet metal ducts shall be cross broken on the four sides of each 4-foot panel. All vertical and horizontal sheet metal barriers, duct offsets, elbows, as well as 4-foot panels of straight sections of ducts shall be cross broken. Crossbreaking shall be applied to the sheet metal between the standing seams or reinforcing angles. The center cross-break shall be of the required height to assure surfaces being rigid.

D. *Round Duct*—Either sheet metal (galvanized) or Fiberglass round duct is acceptable unless shown otherwise on the drawings.

E. *Hanger and Supports*—Hangers for ducts up to 18 inches in width or diameter shall be placed not more than 8 ft. on centers. Ducts 19 inches and over in width or diameter shall be supported on not more than 4-ft. centers. Hangers shall be placed plumb and present a neat appearance. Unless otherwise indicated on the drawings, construct hangers every 5′ – 0″ with 2″ × 2″ × ¼″ angles. The use of perforated band iron for duct support is prohibited. Hangers shall extend down the sides of the ducts using not less than two rivets or sheet metal screws of appropriate sizes and around the bottom of the duct and attached with another sheet metal screw. It is essential that all ducts be rigidly supported. Where vertical ducts pass through floors or roofs, supporting angles shall be attached to ducts and to the structure. Angles shall be galvanized and of sufficient size to support the ductwork rigidly. Place sup-porting angles on at least two sides of the duct.

*Flexible Connections*—Provide flexible connections not less than two inches wide, constructed of heavy water-proof woven asbestos or glass fabric, at the inlet and/or outlet connection of each unit of rotating equipment, securely fastened to the unit and to the ductwork by the galvanized iron band, provided with tightening screws.

*Hand and Splitter Dampers*—Install hand operated volume and splitter dampers in each main and branch supply duct. Volume dampers shall be controlled by heavy duct locking quadreants mounted on the outside of the duct. In unaccessible ducts, the damper rod shall be extended and the operator shall be mounted in the ceiling with cover plates. Where volume dampers are installed in ducts over 12-inches deep, the dampers shall be made in two sections, each independently operated. Splitter dampers shall be at least 1½ times as long as the narrowest adjacent split."

Thus, the responsibility of undertaking the work outlined in subsection 13 D–3 of Section 19 of the specifications, i. e., trimming the structural bases supporting the heating, air conditioning, and ventilating units with a cant strip and covering them with sheet metal flashed into the roof and trimmed with a drip flashing, cannot be said to have rested with Babbitt. The language of the specifications, when read in their entirety, are clear and unambiguous that the responsibility was shared not by Babbitt, but rather by the roofing, sheet metal and carpentry subcontractors.

Judgment affirmed. Costs to respondent.

DONALDSON and SHEPARD, JJ., concur.

BAKES, Chief Justice, concurring specially:

I concur in the action of the Court in affirming the judgment below. However, I disagree with the majority's conclusion that the contract requires that result as a matter of law. The trial court viewed the contract as being ambiguous, and therefore after

hearing extrinsic evidence on the issue found as a matter of fact that the contract did not require Babbitt to perform the work. I agree with the trial court's analysis of the contract. The evidence in the record sustained the trial court's findings, and I would affirm on that ground.

BISTLINE, Justice, specially concurring.

The question here is whether the contract unambiguously provides that someone other than Babbitt was to install the sheet metal, properly flashed, over the raised bases. While a close reading of the contract brings me to the conclusion that it does, there appears to be a misunderstanding by the Court as to the relative duties of the subcontractors.

First, it is obvious from this contract that the carpentry section was to provide the wood bases and the cant strips. No one contests this. As to the next step, the roofing subcontractor installed the roofing and flashed it up the side of the raised bases. This flashing was done with roofing materials, not with sheet metal; it had nothing to do with the present dispute over subsection 13–D–3 of section 19. Thus I cannot agree with the Court when it states that the responsibility of that section was shared by the roofing contractor.

Aside from the foregoing, I am in agreement with the analysis set forth in the Court's opinion. Section 6 clearly states that the sheet metal subcontractor was to perform all the sheet metal work with one exception, and that exception was the ductwork and related sheet metal work, not the sheet metal over the raised bases. Subsection 13 D. 3, of section 19, the disputed section, does indicate, as stated in the opinion of the Court, that Mitchell was responsible for installing the raised bases. The last sentence of that section cannot be attributed as a responsibility of Babbitt, for no one argues that Babbitt should have installed the cant strip.