L.B. INDUSTRIES, INC., a corporation; Paasco Associates, a partnership; James Brown, an individual; and Pack River Investments, a partnership, Plaintiffs,

v.

David M. SMITH, individually, and Control Data Capital Corporation, a Delaware corporation, Defendants.

Civ. No. 83–1226.

United States District Court, D. Idaho.

Feb. 28, 1986.

Chas. F. McDevitt, Givens, McDevitt, Pursley, Webb & Buser, Boise, Idaho, for plaintiffs.

R.B. Rock, Robert B. Luce, Moffatt, Thomas, Barrett & Blanton, Chartered, Boise, Idaho, for defendants.

## MEMORANDUM OPINION AND ORDER

RYAN, District Judge.

## I. INTRODUCTION

This action arises from a series of transactions taking place between 1975 and 1982 involving the purchase and development of small hydroelectric sites in Northern Idaho. The plaintiffs are persons who invested in the development of those hydroelectric sites and now claim they were the victims of fraud. This matter comes before the court on the defendants' Motion for Summary Judgment. Oral argument was held on February 20, 1986.

## II. FACTS

The material facts are not in dispute.

### A. *Background*

In the mid-1970's, William Delp formed Independent Power Developers, Inc. (Independent Power), and Homestake Consulting and Investments, Inc. (Homestake). [Homestake subsequently forfeited its corporate charter on November 30, 1981.] These companies were formed for the purpose of acquiring and developing alternative energy sites. Homestake was formed essentially to acquire and develop energy sites while Independent Power was formed to provide energy systems equipment, including hydroelectric power equipment, for the development of the sites. This action focuses on the development of a number of small hydroelectric sites in Northern Idaho.

In March 1979, Defendant Control Data Capital Corporation (CDCC) invested in Independent Power. CDCC's total investment in Independent Power was $175,000; $50,000 for the purchase of one thousand two hundred fifty (1,250) shares of stock (approximately twenty-four percent of the outstanding shares) and $125,000 for the purchase of seven-year debentures. As a result, CDCC became a minority shareholder and creditor of Independent Power. In addition, Defendant Smith, an employee of CDCC, was designated to sit on the three-man Independent Power board of directors. Smith's purpose was to monitor and document the performance of Independent Power and, as directed by CDCC, to assist Independent Power in the process of becoming a growing concern.

In October 1980, Plaintiff James Brown and Delp executed a letter of intent outlining a joint venture to be formed between Brown and Homestake for the research and development of hydroelectric sites in Northern Idaho. The letter of intent was followed by Brown providing interim financing of approximately $170,000, necessary for the placement of orders and acquisition of parts for the manufacture of nine hydroelectric generating systems and related equipment. Additional financing was contemplated by the letter of intent totaling $450,000. The Brown/Homestake joint venture was formalized on November 20, 1980.

In December 1980, Brown and others incorporated Paasco Associates, a partnership. Brown then assigned all of his rights, duties and obligations in the joint venture to Paasco.

After difficulties arose between Paasco, Brown and Homestake, Delp sought out other investors. Apparently, this led to discussions with Plaintiff L.B. Industries, Inc. These discussions culminated in a series of agreements relating to the construction of several hydroelectric sites. The basic agreement between Homestake and L.B. Industries provided that Homestake would construct a number of hydroelectric sites with equipment to be provided by Independent Power in exchange for fixed payment of $3,837,500.

### B. Smith and CDCC's Involvement in Independent Power

In one of Smith's first reports to CDCC on the condition of Independent Power, Smith noted Delp's difficulties in managing the company and the potential personal dealing by Delp. In a January 24, 1980, report, Smith also noted a need to develop an electronic alternative to the present hydraulic speed control system being utilized by Independent Power.

On November 4, 1980, Smith sent a status report/strategy recommendation to CDCC. This report noted the fact that Delp was selling micro-hydro systems beyond his current system capabilities. The report evidences CDCC's knowledge that Independent Power had sold a unit for delivery in the fall of 1981 requiring an electronic speed controller more advanced than the prototype Autocon[1] was developing. The status report/strategy recommendations projected continued sales beyond current capabilities and recommended that CDCC have Autocon bid, through arms-length negotiations, on developing more advanced controllers. Smith recommended (1) CDCC confront Delp at this time with a marketing focus for Independent Power on small package systems rather than projects beyond current capabilities, and (2) CDCC discontinue providing free technical assistance through Autocon, beyond the programs currently in effect. Smith noted this strategy could prompt Delp to become belligerent and offer to buy out CDCC— "our best option." If Delp backed down, however, CDCC would be in a better position as they would be able to assert more control over Independent Power.

On December 2, 1980, CDCC sent a letter to Delp reiterating CDCC's commitment to provide prototype controllers for operation up to fifty kilowatts (the prototype controllers previously discussed, which were not capable of handling cogeration systems Delp had apparently been selling), but nothing more.

On February 2, 1981, Smith provided CDCC with an "investment reevaluation" regarding Independent Power. Smith noted the continuing deterioration of the condition of Independent Power, as well as recent sales beyond current capabilities. Smith stated that Delp was continuing to look to Control Data Corporation for technical development. Smith also noted a lawsuit was looming by a customer who was dissatisfied with performance of a contract between he and Delp.

---

1. Autocon is a subsidiary of Control Data Corporation. Control Data Corporation is also the parent of CDCC. Autocon was engaged in developing an electronic speed controller for Independent Power, apparently as a result of Independent Power's relationship with CDCC.

On May 28, 1981, Smith stated in correspondence to CDCC that he suspected Independent Power was taking customer deposits for delivery of systems Independent Power may be unable to provide. On June 26, 1981, Smith noted lawsuits were anticipated between customers and Independent Power for nonperformance of contracts for which deposits had been made. On July 14, 1981, CDCC advised Delp of the completion of technical assistance by Autocon for fifty-kilowatt controllers and that no further technical assistance would be provided unless contracted for on an arms-length basis.

Finally, CDCC restructured its investment in Independent Power in June 1982, resulting in withdrawal of CDCC as a stockholder and the concomitant resignation of Smith as a director.

## III.  SUMMARY JUDGMENT—DISCUSSION

Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. As noted, the material facts are not in dispute.

The Complaint contains two counts, both of which seek to impose vicarious and personal liability on Smith and CDCC for the actions of Independent Power. Count one alleges Independent Power misrepresented its financial condition and ability to deliver adequate hydroelectric equipment, both of which were facts material to the plaintiffs' decisions to enter into certain agreements with Independent Power. Count one further alleges that Smith and CDCC (through its agent Smith) participated or acquiesced in this fraud. Counsel for the plaintiffs suggested at oral argument that such participation or acquiescence is manifested in Smith and CDCC's failure to take some action to curb the fraudulent activities of Independent Power.[2]

Count two alleges essentially that Independent Power was the alter ego of CDCC

and William Delp, requiring the corporate veil be pierced, resulting in the imposition of personal liability on CDCC.

### A.  *Fraud*

■  Idaho has adopted the general rule that corporate officers and directors are not individually liable for the conduct of the corporation. *See Paloukas v. Intermountain Chevrolet Co.,* 99 Idaho 740, 588 P.2d 939 (1978); *Barlow's, Inc. v. Bannock Cleaning Corp.,* 103 Idaho 310, 647 P.2d 766 (Ct.App.1982). The Idaho courts have implicitly recognized the existence of, but have not defined, exceptions to the general rule. *Paloukas v. Intermountain Chevrolet Co.,* 99 Idaho at 742, 588 P.2d at 940. One well-recognized exception imposes liability where a director directs or sanctions the wrongful acts:

> It is the general rule that if an officer or agent of a corporation directs or participates actively in the commission of a tortious act or an act from which a tort necessarily follows or may reasonably be expected to follow, he is personally liable to a third person for injuries proximately resulting therefrom. But merely being an officer or agent of a corporation does not render one personally liable for a tortious act of the corporation. Specific direction or sanction of, or active participation or cooperation in, a positively wrongful act of commission or omission which operates to the injury or prejudice of the complaining party is necessary to generate individual liability and damages of an officer or agent of a corporation for the tort of the corporation.

*Escude Cruz v. Ortho Pharmaceutical Corp.,* 619 F.2d 902, 907 (1st Cir.1980) (*quoting Lobato v. Payless Drug Stores,* 261 F.2d 406, 408–09 (10th Cir.1958)). *See Johnson v. Harrigan-Peachland Development Co.,* 79 Wash.2d 745, 489 P.2d 923 (1971); 3A W. Fletcher, *Cyclopedia of the Law of Private Corporations* §§ 1137, 1146 (rev. perm. ed. 1986).

---

**2.** The Complaint actually alleges Smith and CDCC's direct participation in the fraudulent conduct. However, it became apparent from the comments of counsel at oral argument that the plaintiffs claim only indirect involvement.

It is clear from the undisputed facts in this case that Smith did not direct Independent Power's fraudulent conduct, if any, nor did he actively participate in that conduct. Drawing all inferences favorable to the plaintiffs, the record supports only the conclusion that Smith and CDCC knew that Delp was either misrepresenting the company's financial condition and technical capabilities, or failing to disclose its true capabilities.[3] However, it appears from the cases just noted, as well as a review of other cases cited by the parties, that something more than knowledge is required. Counsel for the plaintiffs admitted as much during oral argument. The record must reflect conduct which could be considered knowledge amounting to acquiescence or the implicit sanctioning of the culpable conduct. Alternatively, if liability is to attach, a duty must have arisen imposing upon Smith and CDCC the obligation to take some action to prevent the injury complained of.

While it is clear from the record that Smith and CDCC had substantial knowledge of Independent Power's potentially fraudulent conduct, they did not sanction or approve that conduct. In fact, CDCC's internal documents indicate discontentment with such conduct. CDCC, somewhat less than boldly, suggested to Delp that Independent Power may not be able to meet advertised capacities. CDCC's letters to Delp of December 2, 1980, and July 14, 1981, informed Delp that CDCC would not freely provide or attempt to provide the technology for advanced cogeneration operating systems. Indeed, CDCC was apparently willing to contract with Independent Power in an attempt to develop a controller which would allow performance at the advertised capacities.

Although it appears the legal trend has been toward liberalizing personal liability of directors for wrongful conduct of the corporation (progressing from the requirement of active participation to simply acquiescing in or sanctioning the wrongful conduct), it is clear that the law requires more than mere knowledge of wrongful conduct. Failure to act upon such knowledge must demonstrate, at the very least, that Smith or CDCC implicitly sanctioned the wrongful conduct. Based upon the record, the court finds that reasonable minds could reach only one conclusion: That Defendants Smith and CDCC did not sanction Independent Power's misrepresentation or failure to disclose the company's true financial condition and technical capabilities, nor did the concomitant duty arise which would require Smith and CDCC to take affirmative action to prevent injury from the corporation's wrongful conduct. The defendants are, therefore, entitled to judgment as a matter of law as to count one of the Complaint.

**B. Alter Ego Theory**

Plaintiffs assert essentially that Independent Power was the alter ego of CDCC and William Delp, requiring the corporate veil to be pierced, and imposing personal liability on CDCC.

It is the general rule in Idaho that: [T]he conditions under which a corporate entity may be disregarded vary according to the circumstances of each case.... However, two requirements for application of the doctrine are (1) that there be such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2), that if the acts are treated as those of the corporation an inequitable result will follow....

*Chick v. Tomlinson*, 96 Idaho 483, 485, 531 P.2d 573 (1975) (*quoting Surety Life Insurance Co. v. Rose Chapel Mortuary,*

3. The record clearly establishes that Smith and CDCC were aware that Delp was selling systems which were beyond the *current* capabilities of Independent Power to deliver. This is not to say, however, that the record clearly establishes Independent Power could never produce for delivery equipment capable of supporting operation of the systems Delp was selling. As noted, however, all inferences must be drawn in favor of the plaintiffs. Hence, for purposes of this motion, it must be assumed that Smith and CDCC knew that Delp was misrepresenting the company's ultimate capabilities.

*Inc.,* 95 Idaho 599, 601, 514 P.2d 594, 596 (1973)) (citations omitted). The record clearly demonstrates that Smith and CDCC did not have or take control of Independent Power to the extent there is such a unity of interest in ownership that the separate personalities of the corporation and Smith/CDCC no longer exist. Thus, Independent Power is not the alter ego of Smith and CDCC.

■ However, the Honorable Fred M. Taylor, United States District Judge for the District of Idaho, has ruled in a related case that Independent Power is the alter ego of William Delp. While that determination is not binding on this court as precedent, nor would the defendants be collaterally estopped from asserting a contrary position, such a conclusion poses a question of first impression in this court: If Independent Power is the alter ego of Delp and, therefore, the corporate veil is pierced, is the corporate entity disregarded as to all directors?

Although this matter has not been briefed, nor has the court conducted any independent research, it appears clear that it would be unfair to subject innocent directors to liability for the unscrupulous conduct of a single director who, as president of the corporation, has operated the company as if he and it were one and the same.

The court finds the record demonstrates, as a matter of law, that the corporate entity cannot be disregarded to impose personal liability on Defendant CDCC.

## IV.  ORDER

Based upon the foregoing and the court being fully advised in the premises,

IT IS THEREFORE ORDERED that the Defendants Smith and CDCC's Motion for Summary Judgment should be, and is hereby, GRANTED.

IT IS FURTHER ORDERED that plaintiffs' claims should be, and are hereby, DISMISSED.