828 P.2d 325

**ALPINE PACKING COMPANY, a California corporation, Plaintiff–Respondent,**

v.

**H.H. KEIM COMPANY, LIMITED, an Idaho corporation, Defendant–Appellant.**

**No. 18438.**

Court of Appeals of Idaho.

Jan. 10, 1991.

Rehearing Denied Aug. 15, 1991.

Petition for Review Granted Oct. 9, 1991.

Petition for Review Withdrawn Dec. 20, 1991.*

Eismann Law Offices, Nampa, for defendant-appellant. Richard B. Eismann, argued.

Risch, Goss, Insinger & Salladay, Boise, for plaintiff-respondent. Lawrence E. Kirkendall, argued.

WALTERS, Chief Judge.

This is an appeal by H.H. Keim Co. (Keim) from a summary judgment in favor of Alpine Packing Company (Alpine), holding that there were no material issues of

* Published at 121 Idaho 738, 828 P.2d 301.

fact that would warrant a trial concerning a debt owed by Keim to Alpine, and that Alpine was entitled to judgment as a matter of law. We affirm.

Several transactions form the foundation of this dispute. Alpine, a closely held corporation based in California and engaged in the meat packing business, sold goods worth approximately $36,000 to Keim, an Idaho corporation. Before Keim paid Alpine for the goods, Keim sold approximately $19,000 worth of goods on credit to Made–Rite, Inc., (Made–Rite) another closely held corporation from California and also engaged in meat packing. Before Made–Rite paid its debt to Keim, it went out of business. When Alpine sought payment of the $36,000 due from Keim, the latter paid only $17,000, claiming an offset of the $19,000 due from Made–Rite. Alpine instituted this collection action against Keim for the $19,000. Keim refused to pay, asserting in a cross-motion for summary judgment that because of the familial relationship between the owners of Alpine and Made–Rite, and because of the financing Alpine provided to and the control it exerted over Made–Rite, Made–Rite and Alpine were essentially one business entity, allowing Keim to set off the Made–Rite debt, against its account with Alpine.

The trial court found that although Alpine and Made–Rite were operated by members of the same family and Alpine financed Made–Rite, the record did not establish that Alpine committed any act of wrongdoing which would justify holding it liable for Made–Rite's debt. The court also found that Keim failed to establish complete domination by Alpine over Made–Rite. Based on these findings, the court granted summary judgment for Alpine, disallowing the offset sought by Keim.

Summary judgment is proper only where there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. I.R.C.P. 56(c); *Edwards v. Conchemco, Inc.*, 111 Idaho 851, 727 P.2d 1279 (Ct.App.1986). On appeal we exercise free review in determining whether a genuine issue of material fact exists. *Id.* The determination is to be

based on the "pleadings, depositions, and admissions on file, together with the affidavits, if any." I.R.C.P. 56(c); *Salmon Rivers Sportsman Camps, Inc. v. Cessna Aircraft Company*, 97 Idaho 348, 544 P.2d 306 (1975).

When faced with a motion for summary judgment, a party has the burden of presenting sufficient materials to show that there is a triable issue. *Earl v. Cryovac, A Division of W.R. Grace Company*, 115 Idaho 1087, 772 P.2d 725 (Ct.App.1989). A triable issue exists whenever reasonable minds could disagree as to the material facts or the inferences to be drawn from those facts. *Id.* To preclude summary judgment, a party's case must be anchored in something more than speculation. *Edwards*, 111 Idaho at 853, 727 P.2d at 1281 (1986). Keim promotes three arguments for finding that Alpine controlled Made–Rite. These arguments can be summarized as the assertion that Alpine so directed and controlled Made–Rite that the two had a unified interest, thus Made–Rite should be treated as part of Alpine and not as a separate corporation.

Generally, every corporation will be regarded as a separate legal entity. *Jolley v. Idaho Securities, Inc.*, 90 Idaho 373, 414 P.2d 879 (1966). The powers of a court to disregard a corporate entity must be exercised cautiously. *Id.* Two requirements for application of the doctrine are (1) that there be such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2), that if the acts are treated as those of the corporation an inequitable result will follow. *Baker v. Kulczyk*, 112 Idaho 417, 732 P.2d 386 (Ct. App.1987); *Chick v. Tomlinson*, 96 Idaho 483, 531 P.2d 573 (1975); *Surety Life Ins. Co. v. Rose Chapel Mortuary, Inc.*, 95 Idaho 599, 514 P.2d 594 (1973). *See also Jolley v. Idaho Securities, Inc.*, 90 Idaho 373, 414 P.2d 879 (1966); 18 AM.JUR.2d *Corporations*, § 15, at page 561 (1965); FLETCHER, *Corporations*, § 41, at page 166 (1963). The inequitable result has also been stated as "sanctioning a fraud or promoting injustice." *Baker*, 112 Idaho at

420, 732 P.2d at 389; *Chick*, 96 Idaho at 486, 531 P.2d at 576.

■ Keim grounds its argument in *Chick* and *Surety Life*. Both cases stand for the proposition that individual owners of corporations should not be allowed to commit fraud upon creditors by hiding behind the limited personal liability produced by incorporation. Both cases point up several factors that are relevant in deciding whether to pierce the corporate veil of a corporation to hold its shareholders liable.

In *Chick*, an individual shareholder and his corporation were found to be one and the same entity. Several factors the court considered in reaching this conclusion were (1) the sole shareholder acted as president of the corporation; (2) a lack of corporate formalities, such as directors' meetings; (3) the shareholder's failure to submit corporate contracts and inventory revisions to the board of directors; and (4) the transfer of funds, accrual and payment of accounts, and satisfaction of intercompany claims without approval by any director or officer of the corporation. The court also found that because the sole shareholder disregarded the separate quality of his corporation, maintaining that quality to the disadvantage of creditors would be unjust.

In *Surety Life*, the court found a lack of corporate formalities such as director and shareholder meetings. Also, the court indicated that the two shareholders of one corporation anticipated using the profits from that corporation to offset the losses from their second corporation. The court in *Surety Life* also found that maintaining the corporate form would promote an unjust result.

The case at hand presents some parallels to *Chick* and *Surety Life*. Principally, Made–Rite did not hold regular meetings of its board of directors or shareholders. Also, loans seem to have been taken and repaid without board approval. In this regard, piercing Made–Rite's corporate veil may indicate that its owners, Joseph Kaeslin Jr. and Norma Kaeslin, did not run the business as they should have. However, the actions of Made–Rite's directors and officers do not necessarily lead to the conclusion that Alpine dictated Made–Rite's actions.

Nevertheless, we will review the record to determine whether there exists such a "unity of interest and ownership" that would allow a reasonable inference of control and a disregard of Made–Rite's status as a separate corporation.

Alpine, founded in 1930, is a profitable, closely held corporation. Laura and Joseph Kaeslin Sr., the founders and chief executives, own 57% of its stock. They are the father and mother of Joseph Kaeslin Jr., who started Made–Rite.

Joseph Kaeslin Jr. owned 9% of Alpine's stock and was vice-president until he resigned his position to start Made–Rite. After his resignation, he was hired as a consultant for $1,000 a month, but rendered no services and was never paid. After leaving Alpine, Joseph Kaeslin Jr. visited that facility only three times. From its inception in 1984, Made–Rite's sole shareholders have been Joseph Kaeslin Jr. and his wife Norma. Alpine has never owned any Made–Rite stock. No shareholder or officer of Alpine, other than Joseph Kaeslin Jr., has ever been a shareholder or officer of Made–Rite.

To start Made–Rite, Joseph Kaeslin Jr. borrowed approximately $1.9 million dollars from Security Pacific National Bank (Security Pacific). Alpine put up the security for the loan and acted as guarantor. This action had been approved at a previously held meeting of Alpine's board of directors, where it was agreed that Made–Rite would constitute a ready buyer for Alpine's products and that starting a similar business of its own would cost Alpine $3.6 million dollars. Another stated reason for guaranteeing the loan was that Joseph Kaeslin Jr. was a family member, he had done well at Alpine, and the members of the board believed he would make Made–Rite profitable.

From 1984 to when it closed its doors in 1986, Made–Rite lost money. In those two years, the loans from Security Pacific were increased to over $3 million dollars and Alpine continued to loan money to the dy-

ing enterprise. During this time, Alpine held a meeting of its board of directors to consider buying Made–Rite, but for tax and labor reasons, decided not to. Security Pacific refused to loan Made–Rite more money without some showing of greater profitability, and Made–Rite shut down. Shortly thereafter a fire destroyed the business offices.

Keim does not dispute any of the foregoing facts or that it owes $19,000 to Alpine. Keim asserts, however, that reasonable minds could disagree that the facts allow one to infer that Alpine controlled Made–Rite, and that dismissal of its case on summary judgment was therefore improper.

Keim supports its argument with a memo from Security Pacific which states that Joseph Kaeslin Sr. wanted to buy Made–Rite so Joseph Kaeslin Jr. could "operate" it, not that the son would "own" it. However, Keim overlooks the fact that the same memo says that Joseph Kaeslin Jr. was to operate Made–Rite as a "separate entity." We cannot infer from the word choice of a third party that Alpine wanted to control Made–Rite.

Keim further argues that Alpine's board meeting at which it discussed buying Made–Rite merits an inference of control. The record indicates that Alpine considered the purchase as a way to integrate vacuum packing and sausage production into its operations. However, the record further reveals that the purchase was equally encouraged by Security Pacific as a way to relieve its own concerns about Made–Rite's liquidity, negating the inference of control urged by Keim.

Keim next contends that after the fire, Alpine liquidated Made–Rite's equipment and used the money to pay selected unpaid Made–Rite debts. This contention is not supported by the record which indicates that the liquidation was handled by S. Blondheim & Company, a dealer of new and used food preparation equipment, at the request of Security Pacific and Alpine. Payments for the equipment were forwarded to the bank in accord with the bank's security interest. Alpine did not handle the liquidation. Proceeds of the fire insurance settlement were forwarded to Security Pacific in a similar manner. Alpine did not disburse the fire insurance proceeds to selected unpaid accounts, as Keim asserts.

Keim frequently refers to Made–Rite as a subsidiary of Alpine. However, Alpine owns no stock in Made–Rite, a requirement for establishing parent/subsidiary status. *See* 18 AM.JUR.2d *Corporations*, § 35, at page 830 (1985).

Keim asserts that Made–Rite was "undercapitalized" and that this supports an inference of control by Alpine. Keim's real argument is not that the initial capital of $1.9 million dollars was inadequate to meet Made–Rite's reasonably foreseeable potential liabilities. *See Rice v. Oriental Fireworks Company*, 75 Or.App. 627, 707 P.2d 1250, 1256 (1985). Rather, Keim argues that because Joseph Kaeslin Jr. and Norma Kaeslin personally invested only $10,000 and borrowed the rest from Alpine, such a large investment by Alpine not only implies control but actually makes Made–Rite a subsidiary of Alpine.

The record reflects that Made–Rite was separately incorporated in California. All of its issued stock is owned by Joseph Kaeslin Jr. and Norma Kaeslin. Joseph Kaeslin Jr. and Laura Kaeslin stated in their depositions that Alpine made no effort to control Made–Rite. The record does not support an inference that Made–Rite became a subsidiary of Alpine due to the latter's large investment in the former.

Keim also points to the fact that Made–Rite did not hold regular meetings of its board of directors, that Norma Kaeslin was an officer in name only and had no duties, and asserts that Made–Rite failed to adopt any bylaws. We note that, although these facts may indicate a lack of corporate formality by Made–Rite, thus opening Made–Rite's shareholders to individual liability, they do not support a reasonable inference of control by Alpine.

The record reveals that Laura Kaeslin, managing officer of Alpine since Made–Rite's inception, never discussed Made–Rite business with her husband or her son. Further, both Laura Kaeslin and Joseph

Kaeslin Jr. stated in their depositions that loans from Alpine were never conditioned on controlling Made–Rite. Joseph Kaeslin Jr. also stated in his deposition that Laura Kaeslin never advised or told him how to run Made–Rite. It is apparent from the record that Alpine had no say regarding Made–Rite's lack of formal internal operations.

Keim argues that it "knew" Alpine and the Kaeslin family "owned" Made–Rite, and it relied on that knowledge. The knowledge seems to come from a letter from Made–Rite and two newspaper articles concerning the firm. The letter, from Joseph Kaeslin Jr. advertising Made–Rite's opening, states that "[the Kaeslin] family has been in the wholesale meat processing business in the Stockton area for nearly 50 years." One article says that Joseph Kaeslin Jr. was optimistic about Made–Rite and was "a 20 year veteran of a Stockton packing company, owned by his family...." The second article discloses that Made–Rite was owned by Joseph Kaeslin Jr. and his wife Norma and that the Kaeslin family has owned and operated Alpine for nearly 50 years. An association in the popular press may promote a superficial belief on Keim's part that Alpine and Made–Rite were related, but more is needed to allow a reasonable inference that Alpine actually controlled the firm. The record fails to show that Alpine made any representation that would lead a party to believe that Alpine and Made–Rite were related.

Because we find nothing in the record that would indicate that there was such a unity of interest and ownership that Made–Rite and Alpine ceased to exist as separate corporations, we need not address the second issue as to whether the acts of Made–Rite will promote injustice if its separate identity is upheld.

### Conclusion

We find nothing in the record to reveal any genuine, triable issue of material fact that Alpine controlled Made–Rite. Any other finding would be based on speculation. Therefore, we conclude that the district court did not err when it granted summary judgment to Alpine. The judgment of the district court is affirmed. Costs to respondent, Alpine. As prevailing party in this action Alpine is also entitled to attorney fees under I.C. § 12–120(3), providing for an award of attorney fees in a civil action to recover on an open account, to be calculated according to I.A.R. 41.

SWANSTROM, J., and SMITH, J., pro tem., concur.