445 P.2d 136

**REX T. FUHRIMAN, INC., Plaintiff and Appellant,**

v.

**John E. JARRELL, Defendant and Respondent.**

No. 10925.

Supreme Court of Utah.

Sept. 16, 1968.

Charles P. Olson, of Olson & Hoggan, Logan, for plaintiff and appellant.

George W. Preston, of Preston, Harris, Harris & Preston, Logan, for defendant and respondent.

CALLISTER, Justice:

Plaintiff initiated this action to recover rent on a home occupied by defendants while plaintiff was building defendants a new home. Defendants asserted a counterclaim for damages for breach of the construction contract for the new home. The trial court, sitting without a jury, rendered judgment to the plaintiff in the sum of $865.36 ($858.36 for rent and $7 for damages to a door in the rental unit). The court granted judgment to the defendants in the sum of $1300 ($1200 damages for not waterproofing the basement according to the specifications of the building contract and $100 for a "glaring patch" in the linoleum in the middle of the room). The difference in the two judgments was $434.64, which was awarded in favor of defendants.

Plaintiff-appellant seeks reversal of the award of judgment on defendants'-respondents' counterclaim. Respondents urge that the trial court improperly omitted certain damages in the award.

Plaintiff is a building contractor corporation and has been engaged in building new homes in the Golf Course Subdivision in Logan, Utah. Defendants desired a new home in this area, and they entered into an arrangement with plaintiff whereby defendants would occupy one of plaintiff's completed homes at an agreed rental of $125 a month, while a new home was being constructed pursuant to a building contract between the parties. Defendants occupied the rental unit from September 9, 1964, until April 5, 1965, for a total rent of $858.36.

Upon completion of the new home, plaintiff submitted a final statement to defendants, which included a recitation of the contract price of $20,750 and then specified certain extra charges and credits including the aforementioned rent; the sum of $5,029.65 was indicated as the unpaid balance. Defendants sent plaintiff two checks; one was for $138.36 and recited "Rent (1454 North 16 East) less interest on house money," the other check was for $3,920.10 and recited "In full payment on my home 1675 East 14th North, Logan, Utah." Plaintiff cashed the latter check and returned the rent check as unacceptable.

At the time the parties contemplated construction of the home, the defendants informed plaintiff that they would procure

out-of-state financing from a bank in Tennessee. Defendants made the appropriate arrangements and received $24,000 which they deposited in their names in a local bank on November 6, 1964. The parties orally agreed that while plaintiff was using the funds in the construction of the home, plaintiff would pay defendants 6% interest on the money. Defendants understood this agreement to mean that they would receive 6% of $24,000 or $120 per month from plaintiff from the time they received the loan until completion of the new home. The president of plaintiff understood that he would pay the agreed 6% interest on the funds only as they were disbursed to him. The building contract, although it neither had a provision for this interest agreement nor the rental arrangement, did provide for four draws at various stages of the construction. In plaintiff's computations on the recapitulation sheet, a credit of $182.30 for interest on the loan was indicated as follows: $10,000 for 90 days, $150.30, and $6,000, 32 days, $32. The evidence indicated that the first draw was paid January 5, 1965, for $10,000, and the second draw was March 3, 1965 for $6,000.

On November 10, 1964, three days subsequent to defendants' receipt of the $24,-000 loan, they paid plaintiff $3,900 for the lot upon which the house was to be constructed and received the deed thereto. Defendants, nevertheless, contend that the house and lot were part of a single transaction and that plaintiff is liable for the interest thereon until completion of the house.

█ It was the duty of the trial court in its interpretation of this oral agreement to ascertain the meaning to be given to the words and manifestations of the parties and thus determine their intention.[1]

█ From all the surrounding facts and circumstances, there is nothing to indicate that the trial court erred in its determination that the intention of the parties to the agreement was consonant with plaintiff's interpretation, regardless of defendants' understanding.[2] The construction contract specified a price of $20,750 for labor, materials and supplies and provided a time table for payment according to completion of certain phases of the work, the defendants retained exclusive dominion and control over the funds until they elected to disburse them, and defendants accepted and retained the deed to the property, which was not included in the price of the construction contract.

1. Restatement of the Law of Contracts, § 226, p. 305, and Comment b.

2. The court is using an objective standard, i. e., an average reasonably prudent person would interpret the words and manifestations of the parties as indicative of an intention that interest would be paid only on those funds as they were disbursed to plaintiff.

Defendants' counterclaim is premised on the breach of the construction contract in two particulars: one, breach of the provision to "construct and complete the residence in a good workmanlike manner," and, two, failure to comply with the specifications.

Defendants have alleged that as a result of plaintiff's breach, water has seeped into their basement. The testimony indicated that after the defendants moved into their home in the spring of 1965, the basement began to leak; there were approximately 13 places where the water ran through the walls. Plaintiff sent a man who repaired two of these leaks by drilling out two holes from the inside and filling them with cement. Only two leaks were patched because defendants were assured that when their patio was poured, the leaking would stop; this desired result was only partially achieved. During the spring of 1966, there was additional leakage in the basement. The leaks appeared from two sources, from the areas where the ties came through the foundation and possibly from a honeycomb area, where the cement was not packed in tightly.

█ The dispute as to whether plaintiff complied with the specifications in the contract is dependent upon the meaning of the following provision: "2. Foundations: Waterproofing * * * Asphalt Emulsion."

Plaintiff's president admits that he personally drew the contract and selected the foregoing terms. He testified that there are two methods of waterproofing: one, paint the foundation below ground level with a solution of asphalt emulsion; two, put on a material of thicker consistency than the asphalt emulsion over areas considered to be prime so far as seepage of water in the area. He further testified that for the past 2½ years he has used the thicker material which is applied with a putty or spackle knife to the critical areas in the foundation such as where the tie rods are broken off, rather than painting the entire area with asphalt emulsion.

Counsel queried whether the thicker material was asphalt emulsion; the president responded that he didn't know the technical content of the thicker material and did not know whether or not it was referred to as asphalt emulsion. The president further admitted that while testifying he did not refer to the material as thicker asphalt emulsion but as thicker material. This testimony alone is indicative of the fact that the material actually used was not that designated by the president in the contract.

In addition, defendants called an expert witness, a contractor named Steffenhagen, who testified that it was a custom of the trade that where specifications indicated asphalt emulsion as waterproofing, the entire foundation below ground level was painted with asphalt emulsion. The witness further testified that he had submitted

a bid of $1,200 to dig around the foundation and remove and replace part of the patio and paint the foundation with asphalt emulsion.

Finally, plaintiff's president conceded that in the repair of leaks in a home that he had constructed, if everything else failed, they'd dig out the material around the foundation and apply asphalt emulsion. (This process was the one he specified in the contract that plaintiff would use initially in the construction of the home.)

The trial court did not err in its determination that the specification "Waterproofing—asphalt emulsion" meant a coat of emulsion to be sprayed or painted on the outside of the walls of the basement. This interpretation is not only supported by evidence of the custom of the trade, testimony of which was not refuted by plaintiff, but also the president of plaintiff appeared to recognize a distinction between the material he deliberately specified in the contract and the material he had an undisclosed intention to use.[3]

▆ The trial court correctly adopted as the measure of damages the sum of $1,200, which was witness Steffenhagen's bid to repair the foundation. (Plaintiff's president testified that the cost of repair would be $200. It was the prerogative of the trial court to accord little weight to the testimony of this interested party.) The trial court incorrectly described the damages as the diminution in market value of the dwelling, but it further observed that in the absence of any evidence in the record of value he would adopt the $1,200 figure given by witness Steffenhagen.

Appellant has alleged that the court erred in its award of damages based on a diminution in the market value of the dwelling.

The Restatement of the Law Contracts, § 346(1) sets forth the compensatory damages recoverable for breach of a construction contract as follows:

(a) For defective or unfinished construction he can get judgment for either

(i) the reasonable cost of construction and completion in accordance with the contract, if this is possible and does not involve unreasonable economic waste; or

(ii) the difference between the value that the product contracted for would have had and the value of the performance that has been received by the plaintiff, if construction and completion in

---

3. It is also of significance that the term "emulsion" is indicative of a liquid type substance which would be applied with a paint brush rather than a thicker material which would be applied with a putty knife. In Webster's Third International Dictionary, emulsion is defined as follows:

" * * * b. any of various milky liquids * * * (2): an intimate mixture consisting of a semi-solid or solid (as a resinous or bituminous material) dispersed in a liquid (as—of asphalt in water) * * * "

accordance with the contract would involve unreasonable economic waste.[4]

■ Although the trial court erred in its description of the award of damages, it based its evaluation on evidence of the cost of completion in accordance with the contract; therefore, the award of $1,200 is affirmed.

The final point of contention involves the award by the court of $100 damages to defendants for a "glaring patch" in the linoleum in the new home. The court reasoned that both parties became somewhat compromised and must bear some responsibility, since defendants had been involved in the selection of the linoleum.

The patch is located in the kitchen-dinette area; it is oval in shape and its dimensions are four or five inches wide by six to 12 inches in length. The evidence revealed that there was an obscure piece of material left in the roll; and in the installation process, the mechanic removed and patched this area. The testimony of several witnesses was in sharp conflict both as to the facts surrounding the selection of the linoleum and the subsequent events concerning its possible replacement.

Appellants contend the award of $100 for the flaw in the linoleum was a gratuity. Respondents assert that they are entitled to $372.90, the cost of replacing the linoleum, since the contract to construct and complete their residence in a good workmanlike manner was breached by the use of this material.

From the evidence, the trial court could properly conclude that the replacement of the entire floor would involve unreasonable economic waste (the cited bid included not only replacement of the entire flooring but also the subflooring); therefore, the damages recoverable should be the difference between the value of the performance that had been received and the value of the product if it had been constructed and completed in accordance with the contract. There is nothing to indicate that the court's evaluation of the damage, as a trier of fact, was arbitrary, capricious or unreasonable and unsupported by the evidence

The judgment [5] of the trial court is affirmed.

CROCKETT, C. J., and TUCKETT, HENRIOD and ELLETT, JJ., concur.

4. See Blecick v. School District No. 18 of Cochise County, 2 Ariz.App. 115, 406 P.2d 750, 758 (1965); Christensen v. Hoskins, 65 Wash.2d 417, 397 P.2d 830 (1964); Campbell v. Koin, 154 Colo. 425, 391 P.2d 365 (1964).

5. This opinion affirms the amended judgment of the trial court, which deleted the offset of $182.30 interest, which plaintiff owed defendants against the rent, since defendants had previously received credit in this amount to their account, as evidenced in the recapitulation sheet.