Joseph R. **BAKER**, III, and Jeffrey C. **Little**, Plaintiffs,

v.

**DATAPHASE, INC.**, Michael R. Stewart, and Robert Stewart, Defendants.

No. 89–C–895A.

United States District Court, D. Utah, C.D.

Jan. 17, 1992.

Phillip A. Harding, Salt Lake City, Utah, for plaintiffs.

Jean Robert Babilis, Ogden, Utah, for defendants.

## MEMORANDUM OPINION

ALDON J. ANDERSON, Senior District Judge.

The above-captioned matter was tried to the court on September 11–13, 1991. Phillip A. Harding, of Ogden, Utah, represented the plaintiffs. Jean Robert Babilis, of Ogden, Utah, represented the defendants. At the conclusion of the three-day trial, the court took the issues presented under advisement. Having fully and carefully considered those issues, the court hereby renders its decision.

### I. Facts

Plaintiffs Joseph R. Baker, III, ("Baker") and Jeffrey C. Little ("Little") are former employees of the corporate defendant Dataphase, Inc. ("Dataphase"). Dataphase is a Utah Corporation with its principal place of business at Park City, Utah. The business of Dataphase consists of computer programming and consultation with emphasis on software development, sales and customer service. Specifically, Dataphase was engaged in specialized programming for law enforcement information management systems. The individual defendants, Michael R. Stewart and Robert Stewart, are brothers who each own fifty percent of the outstanding shares of Dataphase. Michael Stewart is the president and chairman of the board of Dataphase; Robert Stewart was until recently a vice president.[1] Both Stewarts were at all relevant time periods and continue to be directors. Both Stewarts also have acted throughout as employees of Dataphase in various consultation, sales or programming capacities.

As of late 1986, both plaintiffs resided in Hawaii and were then employed by Dataphase. At that time, Dataphase maintained a branch office in Honolulu, the entire staff of which consisted of plaintiffs. Baker was the office manager. Dataphase corporate headquarters were at all times located in Park City, Utah. The plaintiffs accomplished their programming duties via modem communications with mainframe computer systems on the mainland; customer service was rendered by long-distance telephone contact. Both plaintiffs occasionally were required to travel to various onsite locations in order to perform software installation and customer service, although Baker testified that he disliked travelling and his duties in that respect were being curtailed at the relevant times. In late 1986, Dataphase, through its management, effected several changes in the status of plaintiffs' employment. It is these changes and the subsequent actions of defendants which give rise to the present actions. Neither plaintiff is currently associated with Dataphase.[2]

---

1. Robert Stewart testified that in 1989, he terminated his service as vice president because he needed to commit his time to other efforts which would generate more income than he was receiving.

2. Baker testified that he terminated his employment in March of 1990. Little did not testify as to his ultimate date of termination of employment relations with Dataphase, although his last statement of services rendered was dated December 21, 1988, and requested compensation for services performed in August 1988.

On September 26, 1989, Little filed the present suit (No. 89C–895A). The complaint alleged breach of employment contract in that Dataphase had failed to pay wages that were then due and further claiming damages under the federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.* On May 17, 1990, Baker filed suit against defendants similarly alleging breach of contract and FLSA damages (No. 90C–445A). The two actions were consolidated on July 9, 1991. Case No. 90C–445A, Doc. No. 8. Because there are significant differences in the facts relevant to each of the plaintiffs' claims, those facts are separately set forth below.

### 1. Little

Little was first employed by Dataphase in June 1984. Initially, his employment was on a part-time basis while he was a student. After approximately one year, Little became a full-time salaried employee. As noted above, his duties were programming, customer support service and on-site installation and service. Sometime in late 1986, Little's employment status with Dataphase was altered.[3] Specifically, Dataphase notified Little that, as of December 1986, Dataphase would pay him on an "hourly" basis rather than a monthly salary. Little testified that his new hourly rate of compensation was $9.95. He also testified that this figure was arrived at by calculating his former monthly salary on an hourly basis. Thus, there was no anticipated net effect on Little's compensation for the same amount of service rendered. Additionally, under the new status, Little was required to maintain and submit invoices for hourly services rendered and expense reimbursement[4] and was further required to withhold his own federal and state income taxes, and to make FICA payments.

At approximately the same time, Little moved from Hawaii to California. Over the next two years, Little changed his residence at least four times.[5] He testified that he still considered himself to be fully and exclusively employed by Dataphase throughout the relevant time period. The Stewarts characterize his position, however, as "independent contractor" and testified that he was contacted only occasionally as the need arose for him to work on special projects. Defendants testified that Little had the ability to accept or reject their proffered assignments as he chose, and Little admitted that although he never recalled declining an assignment, he had that option. There was also evidence that, while he lived in California, Little was engaged in other money-making endeavors, namely, he was involved with a musical group and he took business depreciation deductions on his tax returns for the relevant year for guitars and other musical equipment.

In years 1987 and 1988, Little submitted to Dataphase approximately twenty-one "Statements" which detailed the services he had rendered on an hourly basis and compiled and listed the expenses he incurred while performing those services. Plaintiffs' Exhibit 1. On those statements, Little demanded payment for his services and reimbursement for his expenses. There was no evidence that Little performed services or incurred expenses which

---

**3.** The parties dispute what precipitated the change in Little's employment status. Little claims that Dataphase unilaterally changed his status. Defendants argue that Little was then planning to move to California and in furtherance of that plan Little notified Dataphase that he would be terminating his employment. The evidence was clear, however, that Little did, in fact, move to California and did maintain some, albeit a changed, working relationship with Dataphase.

**4.** Little testified that, even as a salaried employee, he would prepare and submit expense vouchers for reimbursement of travel and other expenses he incurred and personally paid. After the change in his status, however, he had to submit both time and expense invoices.

**5.** Little sent statements to Dataphase setting forth detailed logs of his services performed on an hourly basis and listing his expenses. Plaintiffs' Exhibit 1. On these statements, he made claims for compensation due and instructed that remittances should be sent to addresses which presumably were his residences. Thus, between 1987 and 1989, Little lived in Los Angeles, California; Palestine, Texas; Long Beach, California; and Waco, Texas.

were not reflected in the statements submitted to the court. Based on those statements, over the course of the relevant time period, Little demanded compensation in the amount of $32,945.93 and expense reimbursement in the amount of $5434.74, for a total indebtedness of $38,380.67. Dataphase corporate accounting statements, Defendants' Exhibit F, indicate, and Little does not dispute, that, during the same time period, Dataphase made payments to Little in the amount of $24,404.80. Accordingly, the facts demonstrate that Little received $13,975.87 less from Dataphase than he requested in his monthly billing statements.

In his complaint, Little states three causes of action. The first is based on contract principles as defined by Utah law and is supported by the factual allegation that Dataphase owes him $19,665.37 [6] in unpaid hourly wages and expense reimbursement. In addition to recovery of the amounts owed, Little also seeks statutory interest on the amount owed at a rate of ten percent per annum as prescribed by Utah Code Ann. § 15–1–1(2) (Supp.1991). Little's second cause of action alleges that he was within the coverage of the FLSA and that Dataphase failed to compensate him at the required rate for overtime hours worked. Appended to this cause are claims for 100 percent liquidated damages and attorneys fees as provided by FLSA. Third, Little argues that Dataphase was a sham corporation operated as the alter ego and solely for the personal benefit and advantage of Michael and Robert Stewart. As such, Little argues, the corporate veil should be pierced and any amounts owed him by the corporation should be charged to the Stewarts in their personal capacities.

**6.** At trial, Little testified that Dataphase owes him $19,668.51. This figure is the product of a spreadsheet manufactured by Little. Plaintiffs' Exhibit 2. The figures were entered onto the spreadsheet in Little's own handwriting, and the exhibit was made immediately before or during the trial. In addition to the amounts shown on the 21 monthly detailed statements comprising Plaintiffs' Exhibit 1, Little included in the spreadsheet amounts due for his salary and expenses in the months of October and November, 1986. Dataphase's corporate accounting statements, however, indicate that Little re-

*2. Baker*

In 1983, Dataphase first employed Baker in its Honolulu office on a part-time basis. Baker testified that he was initially retained for his expertise with a certain computer system that Dataphase was then using extensively in its business. Shortly thereafter, Baker became a full-time salaried employee and was made the office manager of the Honolulu branch. As of December 1986, his monthly salary was $3276.68. In that month, coincidentally with the changes that were made in Little's employment status, Baker's pay plan was altered. His title was changed to "Consultant," and his compensation plan was altered. According to Baker, he was still a salaried employee under the new arrangement, but he too was required to withhold his own federal and state income taxes as well as FICA payments. He testified that he performed essentially the same services under the new arrangement. Baker further testified that, at the request of Dataphase management, he calculated the amount of money that would be required to meet his tax withholding requirements under the new arrangement, and that amount was added to his monthly salary. In other words, his $3680.80 per month salary after December 1986 was expressly calculated so as to involve no net decrease in compensation to Baker. In contrast to Baker's version of the new arrangement, Michael Stewart testified that, as of January 1987, Baker was retained as an independent contractor compensated at an hourly rate of $22.00.

In December 1986, the lease on the Honolulu office space was terminated, and the

ceived salary payments for those months. Moreover, unlike the detailed statements for subsequent monthly billing periods, for the months of November and December, 1986, Little has produced no record whatsoever to support the amount of salary and expenses claimed. Because the court finds the actual statements and receipts submitted as Plaintiffs' Exhibit 1 to be a more credible statement of the amounts claimed by Little, it relies on those documents in its conclusion that the true amount owed by Dataphase to Little is $13,975.87.

Hawaii Dataphase branch was closed effective December 18, 1986. Baker testified that Michael Stewart then accepted Baker's offer to take the Dataphase computer equipment to his apartment where he would continue performing Dataphase assignments. Baker did, in fact, move the equipment to his home and continued to do Dataphase work and receive payment for the same until November, 1989. In that month, Baker agreed that he would perform six to eight hours per week of customer service for Dataphase in exchange for an $800 per month salary. This arrangement continued for approximately five months.[7] In March, 1990, when payment under this latter arrangement was not forthcoming from Dataphase, Baker terminated his relationship with Dataphase and subsequently brought the present suit. The time period relevant to the suit is limited to that between January 1987 and October 1989.[8] Dataphase corporate accounting statements [9] demonstrate, and Baker does not dispute, that, during this time period, Dataphase paid Baker $46,074.17. What was actually owed by Dataphase to Baker and to what extent such an amount was offset by the documented payments to Baker was contested by the parties.

Baker argues that he was owed substantially more than the $46,074.17 Dataphase paid him. He claims that under his oral contract of employment with Dataphase, he was entitled to a monthly salary of $3680.80 for the thirty-month period in question, or total payments of $110,402.40. Offsetting the $46,074.17 in acknowledged payments, Baker thus argues he is entitled to $64,328.23.

Michael Stewart testified that, as of January 1987, Baker was an independent contractor who was compensated at an hourly rate of $22.00. Defendants submitted documentary evidence consisting of billing statements which were completed in what Baker acknowledged to be his own handwriting. Defendants' Exhibit O. Those statements reflect that between January 1987 and May 1988, Baker billed for services in the amount of $41,850.15 and received payments totalling $32,051.80. Were the court to rely on these statements, Dataphase would owe Baker at least $9798.35. These statements, however, are not an accurate and complete summary of the contractual relations between Baker and Dataphase during the relevant time period for at least two reasons. First, according to defendants' testimony and other evidence, during the period in question, Dataphase paid Baker $46,074.17. Defendants' Exhibit F. This exceeds the amount of payments as indicated by Baker's monthly statements by $14,022.37. Thus, because defendants admit to having paid Baker far in excess of the amount shown on his statements, they cannot now rely on those statements as being a complete representation of the contractual arrangement with him. Second, the credibility of the statements as being reliable evidence was seriously impugned at trial by Baker's testimony that the statements were prepared long after the fact and had no correlation to actual work performed. Baker stated that he prepared the statements at the direction of Michael Stewart and that the intent of the statements was not to claim or memorialize work performed but was to satisfy record-keeping requirements Stewart felt obliged to observe. Moreover, Baker's explanation is believable because, with limited exception, every amount on an invoice statement corresponded exactly with an amount received as payment and entered on Dataphase's corporate accounting records. Such a correlation suggests that the statements did not reflect actual work performed, but were tailored to meet an unrelated purpose.

---

7. Baker concedes that during this five-month period, he timely received monthly payments of $800.00. Plaintiffs' Exhibit 5. Therefore, this amount is not included in the court's calculations as to amounts owing and paid to Baker.

8. This is a 34–month period. Baker testified, however, that during the months of April, May, June and July of 1989, he took a voluntary four-month leave of absence from all Dataphase work. Accordingly, the relevant time period includes only 30 months.

9. Defendants' Exhibit F.

Defendants alternatively argued that the contractual relationship between Dataphase and Baker could be defined by reference to telephone billing statements. In this respect, defendants argued that, because of the nature of the work involved, the bulk of time spent by Baker in doing Dataphase work would have involved modem or long-distance telephone contact which would have been reflected on telephone billing statements. Specifically, defendants introduced evidence that, during the relevant time period, Baker used long-distance communication for a total of 1324 hours. Multiplied by the $22.00 per hour wage that Michael Stewart testified Baker received, Dataphase would have owed Baker $29,128. Baker testified that all of his work time could not possibly have been represented in telephone billing statements as he spent some quantity of time planning and designing before he actually began the on-line programming and troubleshooting. In any case, this method of calculating the work done by Baker seems unreliable at best.

In his complaint, Baker relies on a contract claim for the difference between the amount owed him, assuming that he was a salaried employee throughout the relevant time period, and the amount paid him, plus statutory interest. Alternatively he argues that he was within the coverage of the FLSA and, as such, was entitled to receive minimum wage for services performed. He further alleges that Dataphase failed to pay him minimum wage for 1,869.6 hours and seeks $6,263.16 for those hours with 100 percent liquidated damages and attorney fees.

## II. Discussion

### A. Contract Claims

Defendants do not dispute that they were contractually obligated to compensate plaintiffs for services rendered and expenses incurred. The court must now ascertain the terms of plaintiffs' respective contracts, determine whether defendants have breached those terms, and then fix damages payable to plaintiffs. Once again, because of significantly different factual and legal considerations, the court will separately address the plaintiffs' claims.

### 1. Little

■ Defendants have plead no affirmative defense that would negate the existence of a valid and enforceable contract between Dataphase and Little. Furthermore, there was no dispute about the relevant terms of that contract, namely, that Dataphase would compensate Little for services rendered at an hourly rate of $9.95. Nor did Dataphase, through its spokespersons, deny that it had agreed to fully reimburse Little for expenses incurred in the process of completing Dataphase related work projects. Defendants' have based their defense to Little's contract claims solely on their argument that, in the preparation of his periodic billing statements, Little claimed compensation amounts that were either disallowed, inadequately described, or unreasonable. In this respect, defendants rely on the testimony of Michael Stewart to the effect that he had reviewed, in detail, Little's billing statements and had identified one of the three defects listed above in some 106 specific billing items. Michael Stewart's efforts to challenge the amount claimed by Little were memorialized in Defendants' Exhibit AA, a multi-page listing of challenged entries on Little's billing statements which specified, for each item, the basis for defendants' challenge to the amount. On that exhibit, defendants conclude that 504.5 of the total 3308.5 billed hours were improperly claimed and consequently, the amount owing to Little should be reduced by $5019.78 (504.5 hours × $9.95 per hour). Were the court to allow this deduction from the total amount due under the contract, Little would be entitled to $8956.09 ($13,975.87 less $5019.78). However, the court refuses to allow defendants to deduct the amount they claim Little overbilled because they offer no credible evidence in support of their argument that Little's claimed amounts were excessive, inadequately described, or disallowed. On the one hand, Michael Stewart testifies that he knows, generally speaking, how much time a given project requires and that the

amounts charged by Little for performing those tasks were unreasonable or disallowed. He therefore urges the court to adopt his unilaterally reduced amounts as a fair measure of the amounts owing to Little. On the other hand, Jeffrey Little, submitted detailed descriptions of the work he performed on a day-to-day basis and recorded the time expended for each task. He apparently made these records simultaneously with the work performed or within a reasonably short time thereafter. That he was meticulous in his record-keeping is evidenced by the fact that he attached actual receipts of expenses incurred to the expense reimbursement requests that were submitted with his statements. There is no evidence that his record-keeping with respect to hours worked was any less accurate. More importantly, the credibility of defendants' argument that Little's statements were exaggerated in amounts is seriously called into question by the timing of the challenge. Whereas the evidence clearly indicated that Little periodically billed Dataphase for his time and expenses over a nearly two-year period, Dataphase apparently never notified Little that his billing statements were unreasonable, erroneous, or inadequate until trial. If Dataphase had bona fide challenges to Little's billing statements, common sense suggests that such challenges would and should have been resolved at or near the time the statements originally were submitted—not some three years later in the course of civil litigation. Accordingly, the court rejects defendants' sole defense to Little's contract claims and awards Little judgment against Dataphase in the amount of $13,975.87 the difference between the amounts claimed on his billing statements and the amount actually paid by Dataphase.

■■■ Little also claims prejudgment interest on the wrongfully withheld amount at the statutory rate of ten percent per annum.[10] Under Utah law, prejudgment interest represents an amount awarded as damages due to the defendants' delay in tendering an amount clearly owing under

an agreement or other obligation. *L & A Drywall, Inc. v. Whitmore Constr. Co.,* 608 P.2d 626, 629 (Utah 1980); *Vasels v. LoGuidice,* 740 P.2d 1375, 1378 (Utah Ct. App.1987). A court may award prejudgment interest where the loss is fixed as of a particular time and the amount of the loss can be calculated with mathematical accuracy. *Jorgensen v. John Clay and Co.,* 660 P.2d 229, 233 (Utah 1983); *Smith v. Linmar Energy Corp.,* 790 P.2d 1222, 1225 (Utah Ct.App.1990).

Under the present facts, an award of prejudgment interest is warranted. Defendants delayed their tender of amounts clearly owed to Little. Additionally, the damages that the court has awarded on the contract claim were fixed as of a particular time and could have been calculated with precise mathematical accuracy had defendants chosen to do so. Prejudgment interest at the statutory rate of ten percent per annum is therefore recoverable by Little.

### 2. Baker

Baker's contract claims present a different problem. As in Little's case, defendants do not dispute the existence of a binding contract under which Dataphase was obligated to compensate Baker for the services he performed. Unlike Little's case, however, the parties do not agree on the essential terms of that contract. As is mentioned above, Baker argues that, after December 1986, he retained his status as a salaried employee with a monthly salary of $3680.08, although he was thereafter required to withhold his own income taxes and pay his own FICA payments. Baker argues that he is entitled to his salary until October 1989. Defendants counter that Baker was an independent contractor paid at $22.00 per hour and, as such, has been paid more than he was entitled based either on billing statements submitted by Baker or on estimates of the number of hours worked as deduced from long-distance telephone billing records. Faced with such contradictory positions, the court must now

---

**10.** "Unless parties to a lawful contract specify a different rate of interest, the legal rate of interest for the loan or forbearance of any money, goods, or chose in action shall be 10% per annum." Utah Code Ann. § 15–1–1(1)(2) (Supp. 1991).

ascertain the true terms of the Baker–Dataphase contract and determine whether the defendants violated those terms.

■ The cardinal rule in interpreting a contract is to give effect to the intentions of the parties and, if possible, to glean those intentions from the contract itself. *G.G.A., Inc. v. Leventis*, 773 P.2d 841, 845 (Utah Ct.App.1989). The contract at issue under the present facts was an oral employment contract; therefore, the court does not have the option of consulting the language of the contract to guide it in ascertaining the intentions of the parties. Moreover, the parties have offered dramatically different testimony regarding the terms of the oral contract. Nevertheless, it is the duty of the trial court to determine the meanings to be given the words and intentions of the parties. *Rex T. Fuhriman, Inc. v. Jarrell*, 21 Utah 2d 298, 445 P.2d 136, 137 (1968). In executing this duty the court should construe the contract so as to give effect to what the parties intended at the time the contract was made. *DuBois v. Nye*, 584 P.2d 823, 824–25 (Utah 1978). In the present case, those intentions must be ascertained by reference to the conduct of the parties under the contract. *See, e.g., Chick v. Tomlinson*, 96 Idaho 483, 531 P.2d 573, 577 (1975) (in construing oral employment contract, extraneous evidence may be used and conduct of the parties under the contract is one of the major factors to be considered).

■ The conduct of the parties under the Dataphase–Baker contract supports Baker's testimony that, under the new arrangement, Baker would maintain a salary that would yield a net payment to him of the same amount as he had been receiving under the pre–1987 arrangements. He testified that this amount was $3680.08 per month. Although defendants never actually paid this exact amount to Baker, the evidence indicates that, at least for the first few months under the new pay arrangement, defendants paid Baker amounts that roughly approximated the amount of his claimed salary. Defendants'

corporate accounting statement reveals that the first two bi-weekly payments to Baker totalled $3762.02. Defendants' Exhibit F. In April 1987, two equal payments were made to Baker totalling $3608.80.[11] *Id.* In May 1987, Dataphase paid Baker $3600.00. *Id.* Although such evidence does not conclusively demonstrate that the parties intended that Baker would receive the salary he claims, it is significantly probative under the present facts. This is especially so in light of the total absence of any evidence that Baker was paid on an hourly basis. Defendants have offered no statement showing how many hours per month Baker worked or that the amounts paid him corresponded in any manner with hours he actually worked. Accordingly, the court concludes that the proper construction of the oral compensation contract entered into by Baker and Dataphase is that Dataphase agreed to pay Baker salary of $3680.08 per month. Over the thirty-month period that Baker worked for Dataphase, he was entitled to $110,402.40. Offsetting the $46,074.17 in payments Baker admits he received, Dataphase thus owes Baker $64,328.23 in unpaid wages.

■ For reasons stated *supra,* and because the damages that the court has awarded on the contract claim were fixed as of a particular time and could have been calculated with precise mathematical accuracy, prejudgment interest at the statutory rate of ten percent per annum is recoverable by Baker.

**B. Fair Labor Standards Act Claims**

Plaintiffs each alleged in their respective complaints that defendants violated various provisions of the FLSA and seek damages and liquidated damages for those violations. The nature of their claims under the FLSA differ significantly, however, and their arguments are addressed separately below.

*1. Little*

In his complaint, Little alleged that, during the relevant time period, he was an

---

**11.** Baker argues that this $3608.80 figure was not coincidental and that it resulted from Data-

phase's simple transposition of the numerals in his promised salary, $3680.08.

"employee" within the coverage of the FLSA, and that, as such, he was entitled to overtime compensation for hours worked in excess of forty hours per week. At trial, Little produced an exhibit which summarized, based on the detailed time sheets he submitted to Dataphase, how much overtime he had worked between January 1987 and August 1988. Plaintiffs' Exhibit 3. Based on that exhibit, Little claims to have worked 1126.5 hours for which he should have received additional compensation in the amount of $4.975 per hour for a total of $5604.34. Little also requests liquidated damages in the amount of $5604.34.

The FLSA provides, in pertinent part:

Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half time the regular rate at which he is employed.

29 U.S.C. § 207(a)(1) (1988). There is no question that Dataphase was an employer, that Dataphase employed Little,[12] or that Dataphase was engaged in commerce.[13] The threshold inquiry in determining whether Little is entitled to damages under the FLSA is therefore to ascertain whether he was an "employee" within the coverage of the statute. By the language of the statute, if Little were more properly characterized as an independent contractor during his association with Dataphase, he would fall outside the coverage of the statute.

The Tenth Circuit Court of Appeals has set forth the analysis to be applied in determining whether persons seeking the benefit of FLSA remedies are independent contractors or employees. In *Dole v. Snell*, 875 F.2d 802 (10th Cir.1989), the court held that the plaintiffs, thirty-two persons who were employed as cake decorators by the defendants, were employees for purposes of the FLSA. *Id.* at 805. Cake decorators employed by the defendant were paid on a piecework basis and had some limited ability to negotiate the rate of compensation for large or complicated projects, although the rate was constant for standard decorating projects.[14] The decorators could generally choose which cake to decorate and had some flexibility in determining their working hours, but those who elected to work in the mornings were requested to report for work by 9:00 a.m. and the defendants requested that the decorators stay until 6:00 p.m. The decorators purchased their own decorating tools and accessories, but defendants paid all of the operating expenses of the business. Finally, the decorators were free to work for other employers or to decorate cakes at home for sale to third parties.

In concluding that the cake decorators were employees within the scope of the FLSA, the court explained that

the Supreme Court has directed that the economic realities of the relationship govern, and the focal point is "whether the individuals economically dependent on the business to which he renders service ... or is, as a matter of economic fact, in business for himself."

*Id.* at 804 (quoting *Bartels v. Birmingham*, 332 U.S. 126, 130, 67 S.Ct. 1547, 1549, 91 L.Ed. 1947 (1947)). The court further noted that there are five factors that courts generally consider in applying the economic realities test:

"(1) the degree of control exerted by the alleged employer over the worker; (2) the worker's opportunity for profit or loss; (3) the worker's investment in the business; (4) the permanence of the

---

**12.** For FLSA purposes, to "employ" is to "suffer or permit [a person] to work." 29 U.S.C. § 203(g) (1988).

**13.** "Commerce" means "trade, commerce, transportation, transmission or communication among the several States or between any State

and any place outside thereof." 29 U.S.C. § 203(b) (1988).

**14.** All facts are drawn from the court's exposition of the facts. *Id.* 875 F.2d at 803–04.

working relationship; and (5) the degree of skill required to perform the work." *Id.* (quoting *United States v. Silk*, 331 U.S. 704, 723, 67 S.Ct. 1463, 1473, 91 L.Ed. 1757 (1947)). The court added a sixth factor: "the extent to which the work is an integral part of the alleged employer's business." *Id.* (citations omitted). No one of these enumerated factors is dispositive and the test is based upon a totality of the circumstances. *Id.*

▮ The question presented is thus whether, upon consideration and application of this six-part test, Little was an employee of Dataphase. It is the conclusion of the court that, based on the totality of the circumstances, Little was not an employee of Dataphase and the FLSA does not therefore govern this case.

First, with respect to the issue of control, Dataphase did not and could not have exerted the type of control over Little that employers traditionally exert over employees. Little moved from Hawaii to California in late 1986 or early 1987. No longer was there contact with Dataphase on a daily or even regularly scheduled basis. Baker, who had been the office manager and who presumably coordinated the activities of Little was no longer present as a representative of Dataphase. Not only was there no regularity of office hours or attendance at the office, but there was no Dataphase office in California. Michael Stewart testified, and Little confirmed, that, when Dataphase required the services of a consultant, it unilaterally contacted Little who had unrestricted freedom to accept or reject the offer, although Little testified that he never turned down an opportunity to work for Dataphase. It is true that, during the relevant time period, Little accepted many assignments from Dataphase and performed extensive service on its behalf. There is no indication, however, that Dataphase dictated in any fashion what hours Little would work or in what manner he performed his assigned task. Little's testimony manifests that when he went on-site to render customer service or program installation, he determined what had to be done and in what

order it would be done. With respect to the overtime hours worked, Little testified that he frequently worked eighteen hours or more per day because the nature of his work simply precluded doing the work in shorter time blocks. Such long shifts were not, however, worked at the demand or direction of Dataphase. In short, after his relocation to California and the change in his status from salaried employee to hourly consultant, Little had unrestricted discretion to determine whether to accept the projects Dataphase asked him to perform. Dataphase did not and could not have exerted any control over his day-to-day activities and even after Little accepted assignments from Dataphase, the corporation apparently had little if anything to say about the manner in which the task was executed. Dataphase did not therefore exert "control" over Little such that he should be classified as an employee for purposes of the FLSA.

Secondly, it must be conceded that Little had no significant opportunity for profit or loss through his association with Dataphase. Although he ultimately controlled how much money he could make as he was free to reject projects as they were assigned, he was not entitled to any profit earned by Dataphase. Moreover, he had no exposure to loss as his only investment was of his time, for which he was legally entitled to set compensation.

Similarly Little made no investment in the business besides his time expenditure in the execution of Dataphase assignments. The shares of Dataphase were owned exclusively by the Stewarts and there is no evidence of any investment of money or equipment upon which Little could have expected a return.

Fourth, the evidence suggests that, after his move to California, Little's relationship with Dataphase was reduced to periodic work as the need arose, and hence he could not seriously have anticipated a permanent relationship. Little testified that he did not, in fact, secure any other employment until late 1988, and his billing statements indicate that he was able to remain occupied on a full time basis for many of the

months between January 1987 and August 1988. Nevertheless, there were also months when Little billed for much less than full time. Plaintiff's Exhibit 1. It is true that one need not be employed on a full-time basis to have a legitimate expectation of permanency in the employment relationship, but in the present case, Little must have known that Dataphase assignments might continue with regularity—or might terminate without notice.

Fifth, both Michael and Robert Stewart testified that a level of specialized skill and knowledge of programming and specific hardware was necessary for Little to perform his assignments. This specialized skill requirement supports the conclusion that Little was an independent contractor. *Cf. Dole v. Snell*, 875 F.2d at 811 ("The lack of the requirement of specialized skills is indicative of employee status.").

Finally, consideration of the sixth factor set forth in *Snell* suggests that Little was an employee. That factor is whether the type of work or services performed by the alleged employee is an integral part of the business. There is no dispute that the services Little rendered to Dataphase and its customers constituted the very essence of Dataphase's business. He directly facilitated programming, installation and customer support. This fact leads to the conclusion that he was an employee because it is presumed that, with respect to vital or integral parts of the business, the employer will prefer to engage an employee rather than an independent contractor. This is so because the employer retains control over the employee and can compel attendant at work on a consistent basis.

Thus, application of the six-part *Snell* test is not dispositive of this case because three factors support Little's claim that he was an employee of Dataphase, and three

factors support the contrary. As is mentioned *supra*, no one of the factors is dispositive of the issue but the decision rests on a totality of the circumstances. Viewing this case in that manner, the court concludes, as a matter of law, that Little was an independent contractor. The opposite result cannot be reconciled with the fact that Little lived in California while the business was in Utah, there was no office in California, work was given to Little on an as-needed basis with no promise of continued future employment, and Little was entirely free to seek alternate or supplemental employment. That Little, in fact, sought no other employment and was apparently able to meet his financial commitments solely by the project-to-project work for Dataphase does not alter this conclusion. Dataphase and its representatives had no capacity to make demands on Little in terms of when or if he worked for them. Accordingly, the court cannot conclude that Little was an employee within the FLSA. Having so concluded, the court need not further address Little's overtime compensation claims which are dismissed.

### 2. Baker

In his complaint, Baker similarly alleges that he was an employee of Dataphase for purposes of the FLSA. He then argues that the FLSA guarantees to every employee within the scope of the statute, a minimum wage for hours worked.[15] Baker claims that he worked for Dataphase during a twelve-month period for which he received no compensation and is entitled to unpaid minimum wages in the amount of $6263.16. He also claims an additional equal amount as liquidated damages.

As with Little's FLSA cause of action, the initial determination the court must make is whether Baker is an employee for FLSA purposes and whether he is other-

---

**15.** Baker relies on the following provision from the FLSA:

Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the following rates:

(1) except as otherwise provided in this section, not less than $3.35 an hour during the period ending March 31, 1990, not less than $3.80 an hour during the year beginning April 1, 1990, and not less than $4.25 an hour after March 31, 1991.

29 U.S.C.A. § 206(a)(1) (Supp.1991).

wise exempted from coverage of the statute.[16] However, even assuming that Baker is an employee and is not otherwise exempted, his minimum wage claims have been rendered moot by the court's disposition of his first cause of action based on breach of contract. The court has already awarded Baker his full claimed salary for the entire period he was associated with Dataphase. Obviously, his salary substantially exceeded the minimum wage guaranteed him by the FLSA and his claim in that respect is superfluous and is accordingly dismissed.

## C. Piercing the Corporate Veil

■■ Fearing a dearth of corporate assets with which to pay them, plaintiffs argue that the Dataphase corporate veil should be pierced and that the court should assign liability to Michael and Robert Stewart in their personal capacities for Dataphase's financial obligations. As a Utah appellate court has recently explained:

> The corporate form protects shareholders from personal liability and will be pierced by the courts with great reluctance and caution. *Colman v. Colman,* 743 P.2d 782, 786 (Utah Ct.App.1987). In order to disregard the corporate entity, two circumstances must be shown: (1) such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, but the corporation is, instead, the alter-ego of one or a few individuals; and (2) if observed, the corporate form would sanction a fraud, promote injustice, or result in an inequity.

*Ringwood v. Foreign Auto Works,* 786 P.2d 1350, 1359 (Utah Ct.App.1990) (quoting *Colman,* 743 P.2d at 786); *see also Salt Lake City Corp. v. James Constructors,* 761 P.2d 42, 46 (Utah Ct.App.1988). The facts of the present case support neither prong of the veil-piercing test. First, there was not such a unity of interest

and ownership that the separate personalities of Dataphase and the Stewarts ceased to exist. To the contrary, the facts show that at all times Michael and Robert Stewart have maintained the corporate identity separate and apart from their own. There was no commingling of funds and what funds that did pass between the Stewarts and Dataphase were clearly memorialized by notes and were timely paid back in full. Nor were corporate assets mixed with personal assets. Both plaintiffs testified that they always knew their contractual relationships involved Dataphase and both admitted that they did not perceive that they were employed by either of the Stewarts as individuals. When the Stewarts transacted business, they always did so in the name of Dataphase. Finally, but not insignificantly, the corporate formalities were observed.

■■ Second, observing and respecting the corporate form in this case will not sanction fraud, promote injustice, or result in inequity. There is no allegation or evidence that either of the Stewarts were using the corporate form to avoid personal obligations. Nor is there evidence of bad faith in the maintenance of the corporate form in the sense that the Stewarts drained corporate assets for personal use to the prejudice of other creditors. Robert Stewart was paid more than Michael Stewart or any other employee. He testified that he was paid at a higher rate than his brother because he had family financial obligations whereas Michael did not and could afford to be paid at a lesser rate. It is true that Robert Stewart was paid more than plaintiffs, but like plaintiffs he never received what the corporation contractually had agreed to pay him. Moreover, he explained that his heightened responsibility within the corporation justified him being partially compensated at a higher rate than plaintiffs were partially compensated. Perhaps it is unfair for a corporate officer to receive

---

**16.** For example, although not argued by counsel, Baker might fit within the FLSA's express exemption for administrative, executive or professional personnel:

  (a) The provisions of section 206 (except subsection (d) in the case of paragraph (1) of this

subsection) and section 207 of this title shall not apply with respect to—
  (1) any employee employed in a bona fide executive, administrative, or professional capacity.
29 U.S.C.A. § 213(a)(1) (Supp.1991).

higher payments than other employees when the corporation cannot pay anyone at their contract rate. Nevertheless, such a fact, standing alone, does not so conclusively prove the existence of fraud or injustice that the corporate veil will be pierced. Accordingly, plaintiffs third cause of action to establish the individual liability of Michael and Robert Stewart is denied.

### III. Conclusion and Order

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that, on plaintiffs' first cause of action for breach of contract, plaintiff Jeffrey C. Little is awarded $13,975.87 for unpaid hourly wages, and plaintiff Joseph R. Baker, III, is awarded $64,328.23 in unpaid salary. Contract damages are awarded only against defendant Dataphase, Inc. Additionally, each plaintiff is entitled to prejudgment interest at the statutory rate of ten percent. Plaintiffs' counsel is hereby ordered to prepare and submit within fifteen days from the date hereof a proposal regarding the computation and amount of prejudgment interest. Defense counsel will have five days thereafter to prepare and submit written response. The court will postpone entry of judgment until plaintiffs' proposal and defendants' answer are received, at which time the court will include such amount as it deems appropriate in its judgment.

On their second cause of action for damages under the Fair Labor Standards Act, the claims of both Little and Baker are denied and dismissed with prejudice. Similarly, plaintiffs' third cause of action to pierce the corporate veil is denied and dismissed with prejudice.